UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Stephen M. Packman, Esquire
Douglas G. Leney, Esquire
ARCHER & GREINER, P.C.
1025 Laurel Oak Road
Voorhees, NJ 08043
Telephone: (215) 963-3300
Facsimile: (215) 963-9999
Email: spackman@archerlaw.com
          dleney@archerlaw.com
*Proposed Attorneys for Debtors*

| | |
|---|---|
| In re:<br><br>PLASTIC SUPPLIERS, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 24-22549<br>(Joint Administration Requested) |

**DECLARATION OF MICHAEL DUFRAYNE IN SUPPORT
OF VOLUNTARY PETITION AND FIRST DAY MOTIONS**

MICHAEL DUFRAYNE, being of full age, hereby declares pursuant to 28 U.S.C. § 1746 under penalty of perjury as follows:

1.  I am the President and Chief Executive Officer of Plastic Suppliers, Inc. ("PSI" or the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"). In that capacity, I am fully familiar with the Debtor's business operations,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are: Plastic Suppliers, Inc. (9518); Sidaplax, Inc. (4275); and Specialty Films, Inc. (4273). The location of the Debtors' service address for purposes of these chapter 11 cases is: 2400-2450 Marilyn Pk. Ln., Columbus, OH 43219.

assets, liabilities, and business records and have firsthand knowledge of the facts as set forth herein. I submit this Declaration in support of the Debtor's voluntary petition and the various "first day" motions (the "First Day Motions") filed in the Chapter 11 Case and described below.

2. This Declaration is intended to provide the Court and parties-in-interest with an overview of the Debtor's business and the circumstances that precipitated the filing of the Chapter 11 Case, as well as to support the factual bases for the First Day Motions. The First Day Motions are necessary to facilitate an orderly and effective transition into chapter 11 while minimizing disruption to the Debtor's business operations. The Debtor intends to operate its business and manage its assets as a debtor-in-possession pursuant to section 1107 of the Bankruptcy Code.

3. Unless otherwise stated, all facts set forth herein are based on my personal knowledge, my review of relevant business records of the Debtor, information provided to me by the Debtor's employees and professionals, or my experience and knowledge with respect to the operations and financial affairs of the Debtor. If I were called upon as a witness, I would testify competently to the facts set forth in this Declaration.

4. To familiarize the Court and parties-in-interest with the Debtor's business, the relief sought in the First Day Motions, and the Debtor's need for relief through chapter 11 of the Bankruptcy Code, this Declaration is organized in the following sections:

    (a) Part I provides an overview of the Debtor's business, including its history, corporate structure, and business operations.

    (b) Part II discusses the Debtor's capital structure, including its assets and liabilities.

    (c) Part III addresses the events precipitating the Chapter 11 Case and the Debtor's goals for the Chapter 11 Case.

    (d) Part IV provides an overview of the relief requested in the First Day Motions and the basis for such relief.

229803938 v5

I. **OVERVIEW OF THE DEBTOR'S BUSINESS**

5. Plastic Suppliers, Inc. was incorporated in the State of New Jersey as PLASTICORP in 1959. PLASTICORP amended its Certificate of Incorporation in 1988 to change its name to Plastic Suppliers, Inc. in 1988.

6. PSI's offices and manufacturing facilities are located at 2400-2450 Marilyn Lane, Columbus, Ohio, 43219. The Debtor's books and records are located at its principal place of business.

7. PSI has, from time to time, traded under the following names: "Plastic Supplier, Inc.", "PSI," "Earthfirst Films," "Earthfirst Films by PSI," "Earthfirst Biopolymer Films by PSI," and "Earthfirst Compostable Solutions."

8. As of October 31, 2024, the Debtor is owned by 73 shareholders. The shareholders comprise three groups: i) 29 direct and indirect individuals and trusts of the Tatem family holding collectively owning 58% of the outstanding shares; ii) the Plastic Suppliers, Inc. and Subsidiaries Employee Stock Ownership Plan owning 16.7% and iii) 43 directors, employees, former employees and other outsiders owning 25.3%, ( the" Shareholders").

9. Organizationally, PSI owns 100% of (i) Specialty Films Inc., and (ii) Sidaplax Inc. (collectively, the "Subs").[2] The Subs are both Ohio registered companies. The Subs are special purpose entities, each holding a fifty percent (50%) interest in Sidaplax V.O.F., a Belgium partnership. The fiscal year end for all the entities is October 31st.

10. PSI is a leading global manufacturer of innovative, environmentally friendly thin-gauged, bio-based material using distinctive biopolymers such as Polylactic Acid ("PLA") and

---

[2] The Subs and their respective case numbers are: (i) Specialty Films Inc., Chapter 11 Case No. 24-22550; and (ii) Sidaplax Inc., Chapter 11 Case No. 24-22551.

Polyhydroxyalkanoates ("PHA"). It also produces petrochemical-based films. It develops highly engineered application-specific solutions for a wide range of companies in the "Consumer Packaged Goods" and industrial markets. PSI provides its sustainable film solutions to customers in the Americas, EMEA region, and Asia.

11. PSI's primary markets include food and beverage packaging, architecture products, medical equipment, personal care, office, industrial and laminated films for SME printers.

12. The Debtor's products are compostable and recyclable and are utilized for, among other things, food and packaging, single-purpose bags, mailers, shrink sleeves, window packaging, envelopes, flow wraps, filters, transparent sealants, barrier sealants, print webs, adhesive labels, thermoforming films and laminates.

13. The Debtor currently has approximately 56 full-time employees and two (2) part-time employees. Of these, 28 employees are salaried, and 30 are hourly.

14. The Debtor pays its salaried employees in the ordinary course on a semi-monthly basis, on the Friday closest to 15th and $30^{th}/31^{st}$ of the month. The Debtor's current semi-monthly total payroll is usually approximately $207,000. Additionally, certain sales employees are paid an automobile allowance and there are occasional reimbursements for business-related expenses (including, but not limited to, travel, gas, materials and tools) advanced by employees. PSI pays its hourly employees in arrears for the week ending the prior Saturday. The Debtor's current weekly payroll in arrears totals approximately $35,000. The payrolls include wages, automobile allowances, applicable taxes and employer matching contributions, were applicable. The payroll is processed by direct deposit into each individual employee's bank account. The Debtor also provides health insurance and other benefits, including a 401(K) with a contributing match for its employees.

15. Prior to the Petition Date, the Debtor maintained three (3) bank accounts (the "Bank Accounts"), including two (2) at KeyBank ("KeyBank") and one (1) at U.S. Bank, N.A. ("US Bank," and together with KeyBank, the "Banks"). One KeyBank bank account is used for collections and is swept every day to the Debtor's senior secured lender, and the other KeyBank account is used to set up disbursements funded by advances by the lender. The US Bank account is funded once per year in order to fund the Debtor's employee stock ownership plan (ESOP) for any annual distributions and diversification payments. In addition, in the ordinary course of business, the Debtor's employees utilize credit cards issued by American Express which the Debtor pays in full monthly, so that employees can pay for maintenance items, travel expenses such as hotel, meals, gas and parking, and incidentals. It is my understanding that both of the Banks are authorized depositories by the United States Trustee for Region 3 and by the Federal Deposit Insurance Corporation (FDIC).

16. With respect to insurance, the Debtor maintains, *inter alia*, general liability, property, equipment breakdown, auto, umbrella, international package, management liability, excess D&O, cargo, inventory cyber, and workers compensation insurance policies. Certain policies are paid on a monthly basis or have been prepaid for the current policy period. The Debtor direct pays the premiums on an installment basis. The Debtor, the Subs and Sidaplax VOF are named insureds on such policies. The Debtor also maintains credit insurance on certain foreign customers.

17. For November 2024 (the first month of FY2025), the Debtor generated revenue of $924,529, and had a net pre-tax loss of $869,764. During the 12-month period ended October 31, 2024, the Debtor generated revenue of $17,488,196 and had an unaudited net pre-tax loss of

229803938 v5

$8,681,303. During the 12-month period ended October 31, 2023, the Debtor reported revenue of $53,565,562 and had a pre-tax loss of $1,181,818.

## II.  PRE-PETITION CAPITAL STRUCTURE

18.  The Debtor's prepetition capital structure is typical of a business of this size and includes a senior secured credit facility as well as certain unsecured debt. The following description of the Debtor's capital structure is based upon the Debtor's books and records.

### A.  Secured Prepetition Debt

19.  According to the Debtor's books and records, prior to the Petition Date, Midcap Business Credit, LLC ("Midcap" or the "DIP Lender") provided a revolving credit facility under that certain Loan and Security Agreement dated as of March 22, 2024 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Pre-Petition Loan Agreement"), by and among the Debtor (as Borrower), the Guarantors (each as Guarantor), and the DIP Lender, and all security agreements, pledge agreements, notes, mortgages, guarantees, control agreements, collateral access agreements, and related agreements and documents (collectively, with the Pre-Petition Loan Agreement, as amended, modified, supplemented, extended, restated, amended and restated, or replaced from time to time, the "Pre-Petition Financing Documents"). The prepetition obligations due by Obligors to the DIP Lender under the Pre-Petition Financing Documents are secured by a blanket, "all assets" lien in favor of DIP Lender and a mortgage on Debtors' real property.

20.  As of the Petition Date $9,101,529 was outstanding under the Midcap credit facility. Based upon the estimated value of the Debtor's assets as established by the Stalking Horse Purchaser's bid, the Debtor believes that, as of the Petition Date, Midcap's loan is fully secured.

6

229803938 v5

### B. Unsecured Prepetition Debt

21.     As of the Petition Date, the Debtor estimates the aggregate of unsecured claims against it to be $7,100,000, which includes approximately $5,200,000 of trade and operating expenses, $65,000 of operating leases, $1,050,000 of obligations due under a shareholder buyback program, $350,000 of customer claims and $366,000 of ESOP distribution and diversification claims. The Debtor has contingent employment contract of approximately $1,700,000. Accrued salaries and wages are estimated to be $125,000 as of the petition date and there are approximately $35,000 for Canada GST taxes.

### III.    EVENTS PRECIPITATING CHAPTER 11 FILING AND BANKRUPTCY GOALS

22.     The Debtor's financial difficulties are a direct result of a combination of (i) US and EU sanctions, (ii) the impact of COVID-19 on sales, and (iii) market headwinds encountered by its strategic shift from fossil fuel-based films to bio-based films.

23.     In and around 2014, the Debtor entered into an agreement with a major consumer brand to supply a specified Earthfirst® film for a new product on an exclusive basis to the brand. The film's components qualified for PSI patents' protection.

24.     The customer's product launched with success internationally in or around 2016. The customer experienced significant product growth. PSI was initially the sole producer of the Earthfirst® film. In or around 2017, the customer – concerned about continuity of supply – began looking to developing additional supply sources.

25.     PSI agreed to install a three-layer blown film line in its Belgian subsidiary for additional supply. The customer provided approximately $7.5 million in secured financing to purchase and install the blown film line with favorable terms and conditions. The customer also

7

agreed to purchase 90% of the line's capacity while there was an outstanding obligation on the financing. The machine's delivery and installation took about 15 months to complete.

26. PSI also agreed to license its Earthfirst® intellectual property and know-how to two (2) European-based film manufacturers to provide additional product to the customer.

27. The customer's product demand peaked in FY2020 at about 20 million pounds of annual shipments by the Debtor, and 31 million pounds on a consolidated basis. The Debtor's revenue associated with the shipments was approximately $50 million and the consolidated product revenue was $78 million in FY2020. The FY2020 product represented about 75% of the Debtor's revenue and 71% of the consolidated revenue.

28. The customer ultimately designated the Debtor and Sidaplax VOF to be the primary product supplier for its Russian facility. In addition, the customer launched second-generation products. The second-generation products did not include the Earthfirst® film in products design.

29. The Earthfirst® films shipment revenue and percentage of revenue held steady in FY2021. During FY2022, the European Commission and the United States government imposed sanctions on the shipment of certain goods to Russia. The EU sanctions were effective July 2022, and greatly affected the Belgian subsidiary's exports.

30. The sanctions, along with lower first-generation product demand, resulted in an approximate year-over-year decline of 35% in FY2022 global product revenue, or about a $27 million decline in consolidated revenue. The Debtor's FY2022 Earthfirst® revenue decline for the exclusive product was about $20 million, or about 41% year-over-year. The Debtor's US shipments were not impacted by the US 2022 sanctions.

8

31. FY2023 brought additional difficult news. In May 2023, the Debtor was informed that the US government had expanded its sanctions regime. These new sanctions now captured the Debtor's exports as well.

32. FY2024 results reflected the full impact of the sanctions. The global revenue impact of the sanctions, together with lower first-generation product demand, resulted in 92% decline in the product revenue from the FY2020/FY2021 high point, or about $71 million. The Debtor alone was impacted by a loss of roughly $45 million, or 90% of its revenue during the same period.

33. While these setbacks had a devastating impact on the Debtor's liquidity, the Debtor continues to work with its customers to develop bio-resin compostable flexible packaging and industrial solutions. The Debtor's consolidated opportunity pipeline has an estimated $95 million value. Included in the pipeline opportunities are about $17 million of commercial development growth opportunities. and $11 million of lamination division growth opportunities. A sample of the projects include compostable cutlery overwraps, home compostable print web snack bags, furniture panels, lidding films, condiment sachets, flow-packs for coffee packages, salad dressing sachets, and more. Nearly all of these projects have 2025 projected commercialization dates. Notwithstanding, given the Debtor's ongoing liquidity constraints, the Debtor believes that a going concern sale of its business will maximize value for creditors and provide the opportunity for its projects to be realized and carry on with its sustainability mission.

34. To that end, API Industries, Inc. d/b/a Aluf Plastics (the "Stalking Horse Purchaser") has expressed an interest in purchasing substantially all of the Debtor's assets (the "Assets") for consideration that would include cash of not less $13,000,000.00, as well as the assumption of certain liabilities. The Debtor and Stalking Horse Purchaser have entered into that

certain asset purchase agreement (the "Stalking Horse APA")[3]. The Debtor intends to use Stalking Horse Purchaser's bid as the stalking horse bid for the Assets (the "Stalking Horse Bid"). Pursuant to the Stalking Horse APA, Stalking Horse Purchaser has provided the Debtor with a deposit in the amount of $1,300,000.00. Based upon the facts and circumstances surrounding the negotiation and execution of the Stalking Horse APA, the Debtor is satisfied that Stalking Horse Purchaser has the financial ability and wherewithal to perform its obligations under the Stalking Horse APA and close on the proposed transaction.

35. The Stalking Horse APA, including the Bid Protections, were negotiated at arms-length and in good faith by Stalking Horse Purchaser and the Debtor over a period of weeks. Both Stalking Horse Purchaser and the Debtor were represented by counsel during those negotiations.

36. The Debtor has determined that the filing of this Chapter 11 Case, in order to pursue the sale described above, presents the best opportunity for the Debtor to preserve going concern value of the business, and maximize value for all creditors.

### IV.    FIRST DAY MOTIONS

37. In order to minimize the adverse effects of the commencement of this Chapter 11 Case on the Debtor's ability to transition into and maximize value, the Debtor has filed certain "First Day Motions" designed to facilitate a smooth transition into chapter 11.

38. I have reviewed each of the First Day Motions with the Debtor's attorneys and other advisors, and the facts stated therein are true and correct to the best of my knowledge, information

---

[3] A copy of the Stalking Horse APA is attached as **Exhibit B** to the Debtor's *Motion for Entry of Orders (I) (A) Establishing Bid Procedures Relating to the Sale of Substantially All of the Debtor's Assets; (B) Approving Bid Protections for the Stalking Horse Purchaser, Including Break-Up Fee and Expense Reimbursement, (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (D) Scheduling a Hearing to Consider the Proposed Sale and Approving the Form and Manner of Notice Thereof and (II)(A) Approving the Proposed Sale, (B) Approving the Assumption and Assignment of Executory Contracts and/or Unexpired Leases, and (C) Granting Related Relief* (defined hereinbelow as the "Sale Motion").

10

and belief. I believe that the relief sought in each First Day Motion is tailored to meet the goals described above and is in the best interest of the Debtor's estate and creditors.

39. The Debtor respectfully requests that the relief sought in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element in preserving the value of the Debtor's estate for the benefit of all parties-in-interest.

### A. Cash Management Motion

40. The Debtor has filed a motion seeking authorization to (i)(a) continue to use the Debtor's existing cash management system, including its primary operating account(s), and (b) maintain its existing bank accounts and business forms, and (ii) implement changes to its cash management system and bank accounts in the ordinary course, including, but not limited to, opening new bank accounts and closing existing bank accounts. continue use of its prepetition bank accounts and for related relief on interim and final bases (the "Cash Management Motion"). Continuing use of the Debtor's existing bank accounts without interruption as a debtor-in-possession account is therefore critical to the Debtor's day-to-day operations, including paying employees, vendors, and other obligations. Any disruption to the Debtor's ability to use such accounts would paralyze the Debtor's business, including delaying projects, and cause immediate and irreparable harm. For these reasons, I respectfully submit that the Cash Management Motion should be granted.

### B. EMPLOYEE WAGE MOTION

41. The Debtor has filed a motion seeking authorization to pay pre-petition employee wages and expense reimbursements, to remit withholding taxes, to continue its health insurance and other employee benefit plans and to pay amounts related thereto, and related relief (the "Employee Wage Motion").

229803938 v5

42. The Debtor pays its hourly Employees in the ordinary course on a weekly basis, every Friday, for the prior week's work. The Debtor's current weekly total payroll is usually approximately $35,000-$40,000 depending, on overtime. The Debtor pays its salaried employees in the ordinary course on a semi-monthly basis, on the Friday closest to 15th and 30th/31st of the month. The Debtor's current semi-monthly total payroll is usually approximately $162,000. Payroll is processed by direct deposit into each individual employee's bank account. The Debtor also provides health and certain other benefits for its Employees.

43. The last payroll date for the Debtor's hourly Employees was on December 19, 2024, which covered the prepetition period from December 8 through December 14. The last payroll date for the Debtor's salary Employees was on December 13, 2024, which covered the prepetition period from December 1 through December 15. The Debtor's first post-petition payroll is scheduled to be paid to salary and hourly Employees on December 27, 2024, which will contain four (4) days of pre-petition wages owed to both hourly and salary Employees for the period from December 16 up to the Petition Date in the aggregate amount of approximately $197,000-202,000 Of that amount, just over half ($111,000) would represent accrued prepetition employee wages.

44. Paying the employee's compensation, honoring all Employee Obligations, and maintaining the Employee Benefit Programs (as such terms are defined in the Employee Wage Motion) are essential to preserve employee morale and to maintain positive relations between the Debtor and its employees. The requested relief in the Employee Wage Motion is critical to the success of the Debtor's goals in chapter 11, and to preserving the going concern value of the business, and I respectfully submit that the Employee Wage Motion should be granted.

229803938 v5

### C. Utilities Motion

45. The Debtor has filed a motion (the "Utilities Motion") seeking the entry of interim and final orders pursuant to 11 U.S.C. § 366, among other things, (i) prohibiting utility companies from altering, refusing or discontinuing service to the Debtor, (ii) deeming utility companies adequately assured of future payment, (iii) establishing procedures for determining requests for additional adequate assurance, and (iv) authorizing the Debtor to establish an adequate assurance deposit in the amount $56,750, representing approximately two weeks of estimated utility expenses, subject to the rights of the utility providers to seek further relief.

46. In the ordinary course of its business, the Debtor utilizes gas, electricity, water, and internet utility services. The Debtor estimates it averages approximately $113,500 per month in utilities. The services provided by the Utility Companies are critical to the ongoing operations of the Debtor as it pursues a going concern sale. If the Utility Companies are permitted to terminate services, even for a brief period of time, the Debtor would be forced to cease operations. That would irreparably harm the Debtor's business and its value as a going concern to the detriment of creditors and other parties in interest. Accordingly, I believe the relief requested in the Utility Motion should be granted on an interim and final basis.

### D. DIP Financing Motion

47. The Debtor has filed a motion (the "DIP Financing Motion") seeking entry of interim and final orders pursuant to sections 105, 361, 362, 363, 364(c), 364(d), 364(e), 506(c), 507, and 552 of the Bankruptcy Code, (i) authorizing the Debtor to obtain up to [●], in post-petition debtor-in-possession financing on a senior secured priming basis (the "Post-Petition Financing") from MidCap Business Credit LLC (together with its successors and assigns in such capacities, collectively, the "DIP Lender") and approving a three dollar to one dollar creeping roll-up during

13

the Interim Period and, upon entry of the Final Order, a dollar-for-dollar roll-up of the remaining Pre-Petition Obligations owed to Pre-Petition Lender into DIP Obligation (collectively, the "Roll-Up"); (ii) authorizing the Debtor's use of cash collateral and approving the proposed adequate protection; (iii) granting the DIP Lender superpriority administrative expense claims and liens; (iv) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the Interim Order and Final Order; (v) prescribing the form and manner of notice and setting the time for the final hearing on this Motion (the "Final Hearing"); and (vi) granting related relief.

48. The Debtor requires immediate funding to ensure that it can pay, among other obligations, its administrative expenses and payroll during this Chapter 11 Case until such time as the going concern sale can be consummated. This interim funding will provide comfort to vendors that continue to work with the Debtor post-petition that such post-petition obligations will be met, and provide customers with assurance that funding is available to enable the Debtor to complete their projects.

49. I believe that the amount of post-petition financing sought on an interim basis is necessary to ensure the Debtor's operations can continue uninterrupted after the Petition Date. Absent such funding, the Debtor's will be irreparably harmed and its going concern value will be compromised. Any disruption to the Debtor's operations would impede its ability to attract new customers and service existing customers, and potentially create a false impression and concern among its customer base that the Debtor is no longer operating. Such a disruption would cause a decline in the Debtor's revenue, impair the Debtor's public standing, and ultimately diminish recoveries to creditors. During this critical time period, it is imperative that the Debtor has necessary funding to continue to operate throughout the sale process.

50. I have been advised by the Debtor's professionals that, no party contacted by the Debtor or its representatives was willing to provide post-petition financing on terms better than the DIP Facility. Similarly, based upon my discussions with the Debtor's professional advisors, I believe the interest rate, fees, reimbursement, and other terms and provisions of the DIP Facility are the product of good faith and arm's length negotiations between the DIP Lender and the Debtor and should be approved.

51. For all of the foregoing reasons, and based upon my discussions with the Debtor's professional advisors, I believe the terms and conditions of the DIP Facility and the proposed use of Cash Collateral are in the best interest of the Debtor, the estate, and creditors, and the DIP Financing Motion should be approved.

### E. Bidding Procedures and Sale Motion

52. The Debtor has filed a motion (the "Sale Motion") seeking entry of an order pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, (i) approving the proposed bidding procedures (the "Bidding Procedures")[4] by which the Debtor shall solicit and select the highest or otherwise best offer for the Assets (as defined below); (ii) approving the bid protections, including the break-up fee and expense reimbursement, for the Stalking Horse Purchaser (as hereinafter defined); (iii) approving certain notice procedures with respect to the Sale (as defined below); (iv) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts; (v) scheduling a hearing (the "Sale Hearing") to approve a sale (as described more fully below, the "Sale") of the Assets (as defined below) and assumption and assignment of executory contracts and unexpired leases and approving the form and manner of notice thereof; and (vi) granting related relief (the "Bidding Procedures

---

[4] A copy of the proposed Bidding Procedures is attached to the Bidding Procedures Order as **Exhibit 1** and is incorporated herein by reference.

15

229803938 v5

Relief"). The Debtor also seeks, pursuant to Bankruptcy Code sections 105, 363, and 365 and Bankruptcy Rules 2002, 6004, and 6006 the entry of an order (the "Sale Order"): (i) authorizing the sale of the Assets free and clear of all liens, claims, liabilities, interests, pledges and encumbrances (other than Permitted Encumbrances) to the Successful Bidder (as defined below); (ii) authorizing the Debtor to assume and assign executory contracts and unexpired leases to the Successful Bidder; and (iii) granting related relief (collectively, the "Sale Relief").

53. As set forth above and in detail in the Sale Motion, the Debtor believes that pursuing a going concern sale of substantially all of its Assets represents the best chance at maximizing the Debtor's value for its estate and creditors.

54. The Debtor is satisfied with the terms and conditions of the Stalking Horse APA, and I believe that the Purchase Price set forth therein represents fair value for the Assets, with such Assets having been marketed by the Debtor's investment banker, SSG Capital Advisors, LLC ("SSG"). The Assets have been exposed to the market pre-petition, and the Stalking Horse APA represents – at present – the highest and best offer for such Assets. Accordingly, I respectfully submit that the Sale Motion should be approved in order to achieve the Debtor's primary goal in this Chapter 11 Case.

I certify that the foregoing statements made by me are true to the best of my knowledge, information, and belief.

Dated:  December 22, 2024                        By: */s/ Michael DuFrayne*
                                                                          MICHAEL DUFRAYNE
                                                                          President/CEO

229803938 v5