UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Stephen M. Packman, Esquire
Douglas G. Leney, Esquire
ARCHER & GREINER, P.C.
1025 Laurel Oak Road
Voorhees, NJ 08043
Telephone: (215) 963-3300
Facsimile: (215) 963-9999
Email:  spackman@archerlaw.com
         dleney@archerlaw.com
*Proposed Attorneys for Debtors*

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 24-22549 (ABA) |
| PLASTIC SUPPLIERS, INC., *et al.*[1] | (Jointly Administered) |
| | **Hearing Date: January 10, 2025 @ 10:00 AM** |
| Debtors. | **Related Docket Nos.:  21, 52, 53** |

**DEBTOR'S COMBINED REPLY TO OBJECTIONS OF (I) UNITED STATES TRUSTEE AND (II) NATUREWORKS LLC AND IN FURTHER SUPPORT OF MOTION FOR ENTRY OF ORDERS (I) (A) ESTABLISHING BID PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) APPROVING BID PROTECTIONS FOR THE STALKING HORSE PURCHASER, INCLUDING BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND (II) (A) APPROVING THE PROPOSED SALE; (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND/OR UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are: Plastic Suppliers, Inc. (9518); Sidaplax, Inc. (4275); and Specialty Films, Inc. (4273). The location of the Debtors' service address for purposes of these chapter 11 cases is:  2400-2450 Marilyn Pk. Ln., Columbus, OH 43219.

229850623 v2

Plastic Suppliers, Inc., the above-captioned debtor and debtor in possession ("PSI" or the "Debtor"), by and through its undersigned proposed counsel, hereby files this combined reply to the objections (collectively, the "Objections") of (i) the United States Trustee ("UST") and NatureWorks LLC ("NatureWorks" and together with UST, the "Objecting Parties") to the Debtor's motion pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1, 6004-2, and 9013-5 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules"), for entry of an order substantially in the form as that submitted herewith (the "Bidding Procedures Order"): (i) approving the proposed bidding procedures (the "Bidding Procedures") by which the Debtor shall solicit and select the highest or otherwise best offer for the Assets; (ii) approving the bid protections, including the break-up fee and expense reimbursement, for the Stalking Horse Purchaser (as defined below); (iii) approving certain notice procedures with respect to the Sale (as defined below); (iv) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts; (v) scheduling a hearing (the "Sale Hearing") to approve a sale (as described more fully below, the "Sale") of the Assets and assumption and assignment of executory contracts and unexpired leases and approving the form and manner of notice thereof; and (vi) granting related relief [D.I. 21] (the "Bidding and Sale Motion"), and in support thereof, the Debtor respectfully states as follows:

## RELEVANT FACTUAL BACKGROUND[2]

1. On December 22, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Court") (the "Bankruptcy Case").

2. No request has been made for the appointment of a trustee or examiner. On January 6, 2025, the UST appointed an official committee of unsecured creditors (the "Committee") in this Bankruptcy Case.

3. On December 24, 2024, the Debtor filed the Bidding and Sale Motion. As further detailed in the Bidding and Sale Motion and in the First Day Declaration, the Debtor's financial hardships have forced it to file this Bankruptcy Case, in an effort to pursue a going concern sale of substantially all of the Debtor's assets, on the terms and conditions more fully set forth in the Bidding and Sale Motion.

4. As more fully detailed in the Bidding and Sale Motion, API Industries, Inc. d/b/a Aluf Plastics, for itself and/or its designee(s) (the "Stalking Horse Purchaser"), has offered to purchase substantially all of the Debtor's assets, excluding accounts receivable (the "Assets"), for $13,000,000.00. The Debtor and Stalking Horse Purchaser have entered into that certain asset purchase agreement (the "Stalking Horse APA"), which is attached to the Bidding and Sale Motion as **Exhibit A**. The Debtor intends to use the Stalking Horse Purchaser's bid as the opening "floor"

---

[2] The background facts regarding the Debtor's pre-petition business, events precipitating the filing of the Bankruptcy Case, and details surrounding the proposed sale of substantially all of the Debtor's assets are more fully set forth in the accompanying First Day Declaration of Michael DuFrayne (the "First Day Declaration"), which is incorporated herein by reference. Also submitted herewith is the Declaration of J. Scott Victor in Support of this Reply (the "Victor Declaration"), which is also incorporated herein by reference. Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the First Day Declaration, the Victor Declaration, and/or the Bidding and Sale Motion, as appropriate context may require.

price at auction for the Assets (the "Stalking Horse Bid") under section 363 of the Bankruptcy Code. Based upon the facts and circumstances surrounding the negotiation and execution of the Stalking Horse APA – which included significant marketing of the Assets and negotiating activities by the Debtor's investment banker, SSG Capital Advisors, LLC ("SSG") (see generally, Victor Declaration) – the Debtor believes that the Stalking Horse Bid is the highest and best offer for the Assets to date.

5. On January 3, 2025, the UST filed its objection to the Bidding and Sale Motion [D.I. 53] (the "UST Objection"). The UST Objection raises two objections. First, it (i) objects to the allowance of the proposed Break-Up Fee included among the Bid Protections afforded to the Stalking Horse Purchaser; and, second, it (ii) seeks the appointment of a "consumer privacy ombudsman" under section 332 of the Bankruptcy Code.[3]

6. Also on January 3, 2025, NatureWorks filed its objection to the Bidding and Sale Motion [D.I. 52] (the "NatureWorks Objection"). The NatureWorks Objection also take issue with the Break-Up Fee.[4] NatureWorks further questions the pre-petition marketing of the Assets by SSG.

**DEBTOR'S REPLY TO OBJECTION AND BASIS THEREFOR**

7. The Debtor respectfully requests that the Bankruptcy Court overrule the Objections in their entirety, grant the Bidding and Sale Motion as proposed, and for the reasons detailed herein, (i) approve the Break-Up Fee and Expense Reimbursement proposed in the Bid and Sale Motion;

---

[3] The Debtor attempted to resolve the UST Objection but was unsuccessful.

[4] The NatureWorks Objection raises other alleged "issues" which are not relevant to the Bid Procedures Motion such as, (i) when Debtor's professionals will file their retention applications; (ii) what the ultimate recovery to unsecured creditors may be in this Bankruptcy Case; and (iii) to certain of the Debtor's agreements to the DIP Loan from MidCap.

4

229850623 v2

and (ii) deny the UST's request for appointment of a privacy ombudsman under sections 363(b)(1) and 332 of the Bankruptcy Code.

A.  **The Proposed Bid Protections are Reasonable, Necessary, and Provide Value to the Estate in the Form of a Concrete, Contingency Free Bid to Serve as a Floor for a Competitive and Valuable Auction Process**

8. Break-up fees (also called termination fees) are routinely offered to potential bidders in asset sales "as an inducement to make a bid or to hold a bid open." 1 Collier on Bankruptcy 15.04 (16th ed. 2018). They are a "common feature of bankruptcy cases as more and more [debtors] rely on sales as an alternative to traditional reorganizations." Id.

9. Generally, break-up fees are a fairly standard – and in many cases such as this – an *essential* component of significant sales under section 363 the Bankruptcy Code. See, In re Integrated Res., Inc., 147 B.R. 650, 659-60 (S.D.N.Y. 1992) ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets … In fact, because the … corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value."). As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. See, In re Energy Future Holdings Corp., 904 F.3d 298 (3d Cir. 2018) (holding that "the allowability of break-up fees … depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (internal quotations omitted); In re Reliant Energy Channelview LP, 594 F.3d 200, 206 (3d Cir. 2010).

10. Here, the Debtor submits that the allowance of the proposed Break-Up Fee is in the best interests of the Debtor's estate ("Debtor's Estate") and its creditors, as the Stalking Horse Purchaser's bid will establish a floor for further bidding that is likely to increase the consideration given in exchange for the Assets for the benefit of the Debtor's Estate.

5

11. Generally, "it is ultimately within a bankruptcy court's discretion to approve or deny a termination fee based on the totality of the circumstances of the particular case." In re Energy Future Holdings, 904 F.3d at 314 (citing In re Reliant Energy, 594 F.3d at 205). "Exercising that discretion and taking into account all of the relevant circumstances, the bankruptcy court must make what is ultimately a judgment call about whether the proposed fee's potential benefits to the estate outweigh any potential harms, such that the fee is 'actually necessary to preserve the value of the estate'" … Id.

12. The leading case in the Third Circuit on the issue of break-up fee allowance remains In re O'Brien Env't Energy, Inc., 181 F.3d 527 (3d Cir. 1999). In that case, the court recognized various factors to be considered in conjunction with the allowance or disallowance of a requested break-up fee:

> The Bankruptcy Court identified at least nine factors that it viewed as relevant in deciding whether to award Calpine a break-up fee and expenses, which we summarize as follows: (1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price; (4) did the unsuccessful bidder (Calpine) place the estate property in a sales configuration mode to attract other bidders to the auction; (5) did the request for a break-up fee serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders; (6) does the fee requested correlate with a maximization of value to the Debtor's estate; (7) are the principal secured creditors and the official creditors committee supportive of the concession; (8) were safeguards beneficial to the debtor's estate available; and (9) was there a substantial adverse impact on unsecured creditors, where such creditors are in opposition to the break-up fee?

In re O'Brien Env't Energy, Inc., 181 F.3d at 536.

13. In this case, analysis of the above applicable factors clearly weighs in favor of allowing the proposed Break-Up Fee. First, the Stalking Horse APA was negotiated heavily back-

and-forth between the Debtor and the Stalking Horse Purchaser (with substantial assistance from SSG). The Debtor and Stalking Horse Purchaser are unrelated, unaffiliated parties with no prior dealings between each other.[5] The Stalking Horse Purchaser would not agree to act as such absent the inclusion of terms conditioning the Stalking Horse Purchaser's bid on the availability of the Bid Protections (which include the Break-Up Fee) (**Factors (1) and (5) above**). In such event, MidCap would not have agreed to extend the DIP loan to the Debtor, thereby forcing a free-fall liquidation. Second, neither the Debtor nor SSG believes that the Break-Up Fee would hamper bidding by other parties, as the parties with whom the Debtor's investment banker has had discussions post-petition have not voiced opposition to the Bidding Protections or amount thereof (**Factor (2) above**). In short, they have not said the Bidding Protections are preclusive to them engaging in the auction process. As set forth in the Victor Declaration (and as cited in similar cases below), the amount of the Break-Up Fee requested here is well within the standard, reasonable range of those regularly approved within the Third Circuit, and will serve to benefit the Debtor's Estate. Absent inclusion of the Break-Up Fee, the Debtor would not have secured the bid of the Stalking Horse Purchaser. This would have resulted in the Debtor's cessation of operations and piecemeal liquidation of the Assets at a substantial discount, resulting in a far less (or perhaps no) return for creditors (**Factors (3) and (6) above**). Finally, the Debtor's only significant secured creditor (and DIP Lender), MidCap, is fully supportive of the Break-Up Fee, and no unsecured

---

[5] The Debtor acknowledges (and apologizes to the Court and parties) that a statement made in the Bidding and Sale Motion, which was noted in the UST Objection, was incorrect. Contrary to Paragraph 58 of the Bidding and Sale Motion, the Stalking Horse Purchaser *did no*t provide any pre-petition loans, advances, or other credit arrangements to the Debtor. The Stalking Horse Purchaser is an arms-length, third-party purchaser of the Assets, with no prior relationship or business dealings with the Debtor. Importantly, the Stalking Horse Purchaser's negotiations with the Debtor, and willingness to act as the Stalking Horse Purchaser here have, in the Debtor's view, kept MidCap engaged with the Debtor, resulted in the Debtor securing a DIP Loan from Midcap, without which the Debtor would not have survived through the holiday season, much less to the anticipated closing of the 363 sale on January 31, 2025. The Stalking Horse Purchaser is providing a clear and continuing substantial benefit to the Debtor's Estate.

creditor other than NatureWorks has objected to or raised any issue with it (**Factors (7) and (9) above**).

14. The case of Reliant Energy, cited in the UST Objection, is distinguishable from the facts here. In that case, the bankruptcy court rejected the proposed break-up fee, and the bidder appealed. Applying O'Brien, the Third Circuit affirmed, reasoning that the bankruptcy court had not "abused its discretion" in determining that the fee "was not necessary to preserve the value of the estate." In re Reliant Energy, 594 F.3d at 210. However, that conclusion rested on a very crucial point: the fee at issue in Reliant Energy was neither necessary to induce the stalking horse's bid nor necessary to prevent it from walking away, since the stalking horse had not conditioned its bid on approval of the fee. Id. at 207-08. Here, however, both of those prongs tip the other way; that is, the proposed Break-Up Fee was *very much a material inducement* to solicit the Stalking Horse Purchaser's bid, and the Stalking Horse Purchaser has the ability to terminate the Stalking Horse APA in the event the Break-Up Fee is not approved by this Court. See, Victor Declaration, ¶¶ 8-9.

15. Moreover, the Break-Up Fee proposed here shall not exceed three percent (3.0 %) of the proposed purchase price. This is an amount that is well within market for transactions of this type, and which has been routinely approved by courts in this district. See, e.g., In re RTW Retailwinds, Inc., No. 20-18445 (JKS) (Bankr. D.N.J., Aug. 8, 2020) [Docket No. 192] (approving break-up fee of up to three percent (3.0 %) of the proposed purchase price); In re SLT Holdco, Inc., No. 20-18368 (MBK) (Bankr. D.N.J., July 13, 2020) [Docket No. 72] (same); In re New England Motor Freight, Inc., No. 19-12809 (JKS) (Bankr. D.N.J., April 8, 2019) [Docket No. 427] (same); In re Aceto Corp., No. 19-13448 (VFP) (Bankr. D.N.J., Mar. 19, 2019) [Docket No. 174] (approving break-up fee of up to two percent (2.0 %) of the cash component of the proposed purchase price); In re East Orange Gen. Hosp., No. 15-31232 (VFP) (Bankr. D.N.J., Dec. 15, 2015)

8

[Docket No. 171] (approving break-up fee of approximately four percent (4.0 %) of the proposed aggregate consideration).

16. Recently, this Court approved a break-up fee of two percent (2.0 %) of the cash consideration component of the total purchase price in In re Bed, Bath & Beyond, Inc., No. 23-13359 (VFP) (Bankr. D.N.J., June 21, 2023) [Docket No. 791]. In the more recent case of Bowflex, this Court approved a break-up fee of three and one-half percent (3.5 %), in conjunction with the bid protections being afforded to the stalking horse purchaser. In re Bowflex Inc., No. 24-12364 (ABA) (Bankr D.N.J., March 8, 2024, [Docket No. 79]. In Bowflex, the Court recognized the importance of break-up fees in conjunction with a debtor's proposed bidding procedures and auction sale, over a similar objection by the UST as made in this case:

> THE COURT: But, generally speaking, courts will refer to the Debtor's exercise of business judgment on how to strike that balance, so long as it reflects a considered judgment about the best interest of the estate. And that's *MTE Holdings* at page 23. Ultimately, Bankruptcy Courts are afforded wide latitude in deciding whether to approve 363 sales. That's *In re: Sunland*, 507 BR 753 at 758, 759.
>
> Here, the Debtors submit, and the Court agrees that the bidding procedures are a valid exercise of their business judgment. Undoubtedly, a determination to sell its assets is within the sound discretion of debtor. *See In re: Culp*, 550 BR 683, *In re: Montgomery Ward Holding Corp.*, 242 BR 147, *In re: Martin*, 91 F. 3d 389, and *In re: Schipper*, 933 F. 2d 513.
> As stated by the Court in *Integrated Resources, Inc.*, 147 BR 650, this Court is also loath to interfere with corporate decisions, absent a showing of bad faith, self-interest or gross negligence. To be sure, none of that was shown here today.
> …
> With that, bidding protections, such as breakup fees, are normal and, in many cases, a necessary component. *See Integrated Resources*, 147 at 659 and 660. Without question, courts in this District, including this Court, have routinely approved breakup fees and expense reimbursements and other protections offered to stalking horse bidders. Moreover, the stalking horse bid protections

> are within market transactions of this type, which are routinely approved by the courts in this District.
>
> …
>
> The Court concludes that the participation of the stalking horse bidder here, with the customary bidding protection is appropriate and necessary to foster a competitive bidding process that will maximize and preserve the value of the Debtor's estate and is reasonable. The Court is grateful that the Debtors and the United States Trustee have resolved the Trustee's objection. Rest assured, this Court considered those objections, Mr. Schepacarter, but I find that the proposed resolutions are the proper result on the issues presented.

In re Bowflex Inc., Transcript of Hearing March 8, 2024, pp. 31-34 [Docket No. 118].

17. Moreover, the Bidding Procedures proposed here do not blanketly *require* the payment of the Bid Protections. Rather, the Debtor's obligation to pay such sums are contingent on the Debtor entering into, and closing on, a Competing Transaction. Given the size of the bid increments proposed in the Bidding Procedures, to the extent that the Debtor elects to consummate a Competing Transaction – and therefore trigger the payment of the Bid Protections to the Stalking Horse Purchaser – it will almost certainly mean that the value of the Competing Transaction will greatly outweigh the value of the Stalking Horse Purchaser's bid to the Debtor's Estate, even factoring in the cost of such Bid Protections.

18. Accordingly, for the reasons set forth above, the Debtor respectfully submits that the Court grant the Debtor the authority to incur and pay the Bid Protections to the Stalking Horse Purchaser to ensure the Stalking Horse Purchaser does not abandon the transaction and defeat the value to the Debtor's Estate of the proposed going concern auction sale process.

**B.  Appointment of a Consumer Privacy Ombudsman is Inapplicable and Unnecessary in This Case**

19. The second argument advanced in the UST Objection is that the proposed Sale is inconsistent with the Debtor's privacy policy pursuant to section 363(b)(1), and, according to the

229850623 v2

UST, a consumer privacy ombudsman should be appointed under section 332. <u>See</u>, UST Objection, ¶¶ 26-35.

20. As a threshold matter, appointment of a consumer privacy ombudsman under section 332 applies only to the "proposed sale or lease of personally identifiable information." 11 U.S.C. § 332(b). "Personally identifiable information" is defined in the Bankruptcy Code as:

> (41A) The term "personally identifiable information" means—
>
> (A) *if provided by an individual to the debtor in connection with obtaining a product or a service from the debtor primarily for personal, family, or household purposes*—
>
> (i) the first name (or initial) and last name of such individual, whether given at birth or time of adoption, or resulting from a lawful change of name;
>
> (ii) the geographical address of a physical place of residence of such individual;
>
> (iii) an electronic address (including an e-mail address) of such individual;
>
> (iv) a telephone number dedicated to contacting such individual at such physical place of residence;
>
> (v) a social security account number issued to such individual; or
>
> (vi) the account number of a credit card issued to such individual; or
>
> …

11 U.S.C. § 101(41A) (emphasis added).

21. Here, the Debtor sells its products only to other commercial entities, not to individual "consumers," and certainly not in connection with "personal, family, or household purposes." Accordingly, the proposed Sale does not involve the transfer of any "personally identifiable information" within the definition prescribed by the Bankruptcy Code, and therefore, section 332 is wholly inapplicable and the UST's argument should fail as a matter of law.

11

22. Moreover, even if section 332 were to apply here, the Debtor submits that its "Privacy Policy" specifically excepts, among other events, a sale of its assets and/or a bankruptcy or other insolvency proceeding. The Privacy Policy states, in relevant part:

Business Transfers

We may disclose and transfer Personal Information to a third party in the event that a merger, acquisition, debt financing transaction, sale of our assets, other similar transaction, or if a bankruptcy, insolvency, or receivership occurs.

See, UST Objection, Exhibit A, [D.I. 54].

23. Accordingly, the proposed Sale is well within the clearly stated exception to the Privacy Policy, and therefore no consumer privacy ombudsman is necessary in this case. To the extent that the UST suggests that the Debtor's privacy policy is "contradictory," as a result of the sub-heading of the title of the Privacy Policy providing, "Plastic Suppliers never sells or gives your contact information to anyone," that is merely part of the title of the Privacy Policy itself and not a term thereof or in any way incorporated therein.

24. Even if such a title were considered to be a substantive component of the Privacy Policy itself, basic rules of statutory construction provide that where a general rule may be contradicted by exceptions within the same statute, the exceptions are controlling. See, e.g., RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645, (2012) ("A well-established canon of statutory interpretation succinctly captures the problem: '[I]t is a commonplace of statutory construction *that the specific governs the general.*'" (quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992)) (emphasis added). "The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one." RadLAX, 566 U.S. at 645.

25.     Finally, the word "consumer" is not defined in section 101 of the Bankruptcy Code. "Consumer debt," however, is defined as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8).  As stated above, the Debtor sells only to other commercial entities, not to individual "consumers."  Using the common-sense definition of the word as set forth in the Bankruptcy Code, there is no personally identifiable information relative to individual "consumers" that would require any protections of a consumer privacy ombudsman under section 332.  Accordingly, the Debtor respectfully submits that the UST's request for appointment of such an ombudsman be denied.

C.    **The Pre-Petition Marketing Process By SSG Was Robust and Continues to Generate Substantial Interest in the Assets Post-Petition**

26.     The Debtor has more than adequately marketed its Assets, pre and post-petition, for sale.  For example, as further detailed in the Victor Declaration:

> In connection with the latter (exploring sale options), SSG solicited interest from a total of 462 parties prior to the Petition Date. 74 of those 462 parties executed non-disclosure agreements (NDAs) and two (2) parties submitted non-binding letters of intent with respect to a sale, one of whom was API Industries, Inc. d/b/a Aluf Plastics (the "Stalking Horse Purchaser").
>
> Following the Company's bankruptcy filing, SSG launched another marketing process and solicited competing offers to the stalking horse bid from a total of 553 parties.  The 462 parties contacted pre-petition were also contacted on a post-petition basis.  Four (4) additional parties executed NDAs on a post-petition basis, and, as the Court is aware, one (1) party has submitted a qualified bid (the Stalking Horse Purchaser).
>
> SSG continues to solicit interest for the Assets post-petition, and has been in contact with a number of parties, some of whom have executed NDAs and have begun diligence on the Assets.  Based upon SSG's activities both pre-petition and post-petition, I believe that there is a real possibility that an auction in this case will result in active bidding, and potentially a higher and better offer than that presented by the Stalking Horse Purchaser.

13

See generally, Victor Declaration.

27.     To the extent relevant, NatureWorks' Objection that the Assets have not been marketed sufficiently by the Debtor should be overruled by the Court as that is plainly not the case.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court overrule the Objections in their entirety, enter an Order approving the relief requested in the Bidding and Sale Motion; and granting the Debtor such other and further relief as the Court deems appropriate.

Dated: January 7, 2025                                    **ARCHER & GREINER, P.C.**

*/s/ Stephen M. Packman*
Stephen M. Packman
Douglas G. Leney
1025 Laurel Oak Road
Voorhees, NJ  08043
(215) 963-3300
(215) 963-9999 (fax)
spackman@archerlaw.com
dleney@archerlaw.com

*Proposed Counsel to the Debtor*