| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1** | |
| **PORZIO, BROMBERG & NEWMAN, P.C.**<br>100 Southgate Parkway<br>P.O. Box 1997<br>Morristown, NJ 07962<br>Telephone: (973) 538-4006<br>Brett S. Moore, Esq. (bsmoore@pbnlaw.com)<br>Kelly D Curtin, Esq. (kdcurtin@pbnlaw.com)<br>*Proposed Counsel to the Official Committee of*<br>*Unsecured Creditors* | |
| In re:<br><br>PLASTIC SUPPLIERS, INC., *et al.*<br><br>                            Debtors.[1] | Chapter 11<br><br>Case No. 24-22549 (ABA)<br><br>(Jointly Administered) |

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTIONS OF DEBTORS FOR ENTRY OF FINAL ORDERS (A) (I) AUTHORIZING THE DEBTOR TO OBTAIN SENIOR SECURED PRIMING POSTPETITION FINANCING AND APPROVING THE ROLL-UP; (II) AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL AND APPROVING ADEQUATE PROTECTION; (III) GRANTING PRIMING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF; AND (B) (I) (A) ESTABLISHING BID PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) APPROVING BID PROTECTIONS FOR THE STALKING HORSE PURCHASER, INCLUDING BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND (II) (A) APPROVING THE PROPOSED SALE; (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND/OR UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Plastic Suppliers, Inc., (9518) Chapter 11 Case No. 24-22549-ABA; Sidaplex, Inc. (4275) Chapter 11 Case No. 24-22550-ABA; and Specialty Films, Inc. (4273) Chapter 11 Case No. 24-22551-ABA. The location of the Debtors' service address for purposes of these chapter 11 cases is: 2400-2450 Marilyn Pk. Ln, Columbus, OH 43219.

The Official Committee of Unsecured Creditors (the "Committee") of Plastic Suppliers, Inc., *et al.*, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its proposed undersigned counsel, hereby files this omnibus objection (the "Objection") to entry of final orders granting certain the relief requested in Debtors' (i) DIP Motion (defined below); (ii) Bid Procedures Motion (defined below).  In support of this Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The recently appointed Committee selected counsel approximately 24 hours prior to the deadline for this Objection to be filed and is forced to confront what may be the most critical hearing in these cases with very little time to get up to speed, much less engage in wholesome review of all of the facts and issues present in these cases. While the Committee is pleased that a stalking horse purchaser has emerged, it has a number of concerns that have not been adequately explored, or even fully identified, given the extraordinarily compressed timeline for the objections and hearing.

2.      Preliminarily, this Court should not allow this process to proceed on MidCap's pre-ordained timeline, which has not only put the Committee in this difficult position of filing a response in less than eight (8) business hours from selection of counsel, but also dictates a bid deadline a mere eleven (11) days from now—ten (10) days from the scheduled hearing.  While the Committee understands that the Debtors are facing a liquidity crisis[2] and that SSG was engaged

---

[2] The Approved Budget projects "Total Cash In" in the aggregate amount of $1,562,047 for the period of 12/8/2024 through 02/01/2025, which appears insufficient to cover the Debtor's purported operating expenses as stated in the Approved Budget, which are collectively $3,317,701 and identified by the following terms and during the same period total the amounts as follows :Payroll, Taxes and other Withholdings: $762,500; BUILDING & EQUIPMENT MAINTENANCE $61,670.00, EMPLOYEE TRAVEL $20,000.00,  FREIGHT $132,959.00,  HR $8,955.00, Bank Fees  $3,102.00, IT  $44,370.00, LEASE  $12,067.00, LEGAL  &  PROFESSIONAL  $677,023, MATERIAL $1,017,413.00, QUALITY PROGRAM $2,088.00, UTILITIES $197,592.00, COMMERCIAL INSURANCE $40,056.00, MEDICAL INSURANCE $195,473.00, WORKERS COMP $7,432.00, IP $50,000.00, PROPERTY TAX $85,000.00.

2

and has been marketing these assets since August and is therefore comfortable with an expedited timeline, the proposed timeline should be modified as set forth herein..  Among other things, given the Debtors near Christmas Eve filing, key decision makers of companies are only now returning to the office.  Requiring bids be submitted a mere 10 days (and only five (5) business days) after the bidding procedures hearing seems destined to fail.  Moreover, the proposed bid deadline of January 20, 2025 is both Inauguration Day and Martin Luther King Jr. Day.  While one may assume that SSG is in contact with prospects, a chapter 11 filing often brings new parties to the table and triggers, or renews, interest—all of which may be compromised if the proposed bid deadline is maintained.  Furthermore, the timeline will not provide the Committee with sufficient time to investigate MidCap's purported secured claim[3] or to evaluate the causes of action that are purported to be sold—which appear to be all causes of action other than Avoidance Actions.  *See* Bid Procedures Motion, Ex. A, APA §§ 1.1 (vii) (referencing the purchase of causes of action "related to any Purchased Assets or the Business").  Most importantly with respect to the timeline, the requirement that a sale close two days after the proposed hearing date for the approval of the sale of the Debtor's assets or otherwise face an additional fee that would be owed to Midcap is problematic as the closing of the sale will be not within the sole control of the Debtor.

3.      Additionally, while the Committee's review of the proposed bidding procedures (the "<u>Bid Procedures</u>") is ongoing, certain modifications should be made to ensure a fair and equitable sale process that maximizes estate value. Key modifications include ensuring that Committee professionals are full and active participants in evaluating bids and any auction that occurs, the exclusion of causes of action from the proposed sale, the inclusion of clear language that the stalking horse agreement remains subject to higher and better offers and is not pre-

---

[3] While the Committee has been told by the Debtors that MidCap is unlikely to credit bid, it reserves the rights to do so.

approved until entry of the final sale order, and make other revisions consistent with maximizing value.[4]

4. With respect to the DIP, the DIP Motion and associated exhibits totaling 220 pages, the Committee has not had sufficient time to read, let alone fully digest its terms. At first glance, it appears to be onerous, and replete with excessive features and burdensome terms. Indeed, many terms refer to other defined terms and formulas, the calculation of which is impossible for the Committee to even perform at this stage without all of the underlying financial data. Accordingly, the Committee is primarily concerned with preserving its ability to potentially challenge any claims that may be available against MidCap. On this point, the Challenge period cannot be illusory—the Committee needs assurance of a full preservation of rights, adequate time and an adequate budget to perform its fiduciary duties without the worry of indemnification and fees and costs associated with any Challenge being borne by the estates. The prepetition loan documents, some of which have been received, are similarly lengthy, and the Committee notes that they included a $450,000 early termination fee that was triggered, and although the Committee has not yet seen the detail, it is presumably included in MidCap's asserted claim amount that is proposed to be rolled-up (the "Default Penalty"). Prepetition Loan Agreement, ¶12(b) ("if any Event of Default . . . occurs . . . the Borrowers shall pay to the Lender a termination fee in an amount equal to (i) $450,000 if the termination occurs on or before the first (1st) anniversary of this Agreement").

5. While this Objection outlines the Committee's initial concerns with the DIP and the Bid Procedures, the Committee reserves its rights to raise the same and/or additional objections prior to and at the hearing and any future hearing, including the Sale Hearing. Although the Committee has not had time to engage with all the key parties (except for a single introductory call

---

[4] Among other things, the APA lacks a provision requiring reasonable cooperation with respect to sharing and access to the Debtors books and records, and we would expect that such provision be incorporated.

7947040

with the Debtors and SSG hours after the Committee selected proposed counsel), the Committee

and its advisors stand ready to hold any and all discussions with MidCap and the Debtors to achieve

the Debtors' goal of obtaining adequate capital to conduct and consummate a robust sale process.

As drafted, the Bid Procedures Motion and the  DIP Motion do not accomplish this goal and should

be revised consistent with the terms set forth in this Objection.

## **BACKGROUND**

### **A.  General Case Background**

6.      On December 22, 2024 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

(the "Bankruptcy Code") commencing these cases (the "Chapter 11 Cases") in the United States

Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").

7.       Since the Petition Date, the Debtors have been authorized to continue to operate

their business and manage their property as debtors-in-possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

8.      On January 6, 2025, the Office of the United States Trustee for Region 3 appointed

a three-member Committee consisting of: (i) TotalEnergies Petrochemicals & Refining USA, Inc.;

(ii) NatureWorks LLC; and (iii) Biome Bioplastics Inc. c/o Biome Technologies PLC (collectively,

the "Committee").  On January 8, 2025, and subject to Court approval, the Committee selected

Porzio, Bromberg & Newman, P.C. as proposed counsel to represent the Committee.

### **B.  The Debtors' Business and Prepetition Capital Structure**

9.      The Debtor "is a leading global manufacturer of innovative, environmentally

friendly thin-gauged, bio-based material using distinctive biopolymers such as Polylactic Acid

("PLA") and Polyhydroxyalkanoates ("PHA").  It also produces petrochemical-based films.   It

develops highly engineered application-specific solutions for a wide range of companies in the

7947040

"Consumer" Packaged Goods" and industrial markets.  PSI provides its sustainable film solutions to customers in the Americas, EMEA region, and Asia." *See Declaration of Michael Dufrayne, the President and Chief Executive Officer of Plastic Suppliers, Inc., in Support of Debtors' Voluntary Petitions and First Day Motions* [ECF No. 13] (the "First Day Dec.") ¶ 10.

10.     Prior to the Petition Date, MidCap Business Credit, LLC ("MidCap" or the "DIP Lender") provided a revolving credit facility under that certain Loan and Security Agreement dated as of March 22, 2024 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Pre-Petition Loan Agreement"), by and among the Debtors (as Borrower), the Guarantors (each as Guarantor), and the DIP Lender, and all security agreements, pledge agreements, notes, mortgages, guarantees, control agreements, collateral access agreements, and related agreements and documents (collectively, with the Pre-Petition Loan Agreement, as amended, modified, supplemented, extended, restated, amended and restated, or replaced from time to time, the "Pre-Petition Financing Documents").  The prepetition obligations due by Obligors to the DIP Lender under the Pre-Petition Financing Documents are purportedly secured by a blanket, "all assets" lien in favor of DIP Lender and a mortgage on Debtors' real property.  First Day Dec. ¶ 19.

11.     As of the Petition Date, $9,101,529 was purportedly outstanding under the MidCap credit facility.  First Day Dec. ¶ 20.

**C.  The Debtors' Pre-Petition Loan With MidCap And The Default Penalty**

12.     As noted, on March 22, 2024. the Debtors entered into the a  (the "Prepetition Loan Agreement") with MidCap Business Credit, LLC as lender.  The Debtors have provided the Committee with some prepetition loan documents which have largely not yet been reviewed given the timeline.  Of particular interest, a $450,000 termination fee is referenced and is presumably a part of the asserted claim amount that is proposed to be rolled-up under the terms of the DIP.  *See*

7947040

Prepetition Loan Agreement, ¶12(b) ("if any Event of Default . . . occurs . . . the Borrowers shall pay to the Lender a termination fee in an amount equal to (i) $450,000 if the termination occurs on or before the first (1st) anniversary of this Agreement").

### D. The DIP Motion

13.     On the Petition Date, the Debtors filed the *Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtor To Obtain Senior Secured Priming Post-Petition Financing And Approving The Roll-Up; (II) Authorizing The Debtor's Use Of Cash Collateral And Approving Adequate Protection; (III) Granting Priming Liens And Superpriority Administrative Expense Claims; (IV) Modifying The Automatic Stay; (V) Scheduling A Final Hearing; And (VI) Granting Related Relief* [ECF No. 12] (the "DIP Motion"), seeking senior secured post-petition financing on a superpriority basis (the "DIP Financing") in an aggregate principal amount of up to $15million (the "DIP Facility") pursuant to the terms of a *Debtor in Possession Loan and Security Agreement dated December 23, 2024* (the "DIP Agreement"), by and among the Debtors and Business Credit LLC as servicer for MidCap Funding, LLC as lender (collectively, "MidCap").

14.     The "Approved Budget" annexed to the Interim Order has not been vetted by the Committee, and frankly, is not easily understood.  It does not contain totals, or footnotes explaining the line items (which may materially understate certain expenses likely to be incurred during the sale process, including professional fees), nor does it contain any underlying assumptions or other notes.   Insofar as it ends February 1, 2025, it does not account at all for the funding needed to wind down these Chapter 11 Cases, whether through a post-sale plan or other mechanism.  Furthermore, it does not clearly identify the cash coming-in from the DIP loan.  Is it intended that the DIP will be used to fill the negative numbers in the "Cash Flow" line?  Those negative amounts

total $1,786,544.[5]  However, the inclusion of negative "Line Availability" in nearly every week further confuses matters as it is unclear whether that impacts borrowing.  Finally, it does not indicate the anticipated cash coming in from the proposed sale for which there is a $13 million stalking horse bid, or the intended outflow of those funds.

15.    Further, the DIP Motion seeks approval of a complete roll-up of the prepetition loan balance owed to MidCap (*purportedly*, $9,101,529.19) (the "Roll-Up").  Meanwhile, to the extent the new money coming in from the DIP Loan totals $1,786,544, it comprises a shocking 12% of the purported $15 million DIP facility, (*i.e.*, the purported DIP "loan" provides little new money for Debtors' operations, and is instead designed to extract value for MidCap to the detriment of unsecured creditors.

16.    The Court convened an interim hearing on the DIP Motion on December 23, 2024, and entered an order approving the DIP Motion [ECF No. 31] (the "Interim DIP Order") on an interim basis, scheduling a final hearing on the DIP Motion for January 10, 2025.

### E.  The Bid Procedures Motion

17.    On December 24, 2024, the Debtors filed a *Motion For Entry Of Orders (I) (A) Establishing Bid Procedures Relating To The Sale Of Substantially All Of The Debtor's Assets; (B) Approving Bid Protections For The Stalking Horse Purchaser, Including Break-Up Fee And Expense Reimbursement, (C) Establishing Procedures Relating To The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases; and (D) Scheduling A Hearing To Consider The Proposed Sale And Approving The Form And Manner Of Notice Thereof and (II) (A) Approving The Proposed Sale; (B) Approving The Assumption And Assignment Of*

---

[5]  The DIP Agreement provides in part that "the aggregate principal balance of all Revolving Loans funded under this Agreement outstanding at any one time shall not exceed $1,042,788".  DIP Agreement, ¶1(a).

7947040

*Executory Contracts And/Or Unexpired Leases; and (C) Granting Related Relief* [ECF No. 21] (the "Bid Procedures Motion").

18.    The Bid Procedures Motion seeks to establish procedures in connection with the sale of the Debtors' assets to API Industries, Inc. d/b/a Aluf Plastics (the "Stalking Horse Bidder") for cash consideration of not less than $13 million, as well as the assumption of certain liabilities, and subject to higher or otherwise better offers pursuant to an open auction process. *See* Bid Procedures Motion ¶¶ 8-10.

19.    The Bid Procedures Motion also seeks approval of (i) specific procedures for bidding on the Debtors' assets and conducting an auction of the Debtors' assets (if necessary), (ii) bid protections for the Stalking Horse Bidder, including a break-up fee and expense reimbursement; and (iii) notice and related procedures relating to the assumption and assignment of executory contracts and unexpired leases. *See* Bid Procedures Motion ¶¶ 10-18.

## **OBJECTION**

20.    A debtor seeking DIP financing must show that such financing is necessary to preserve the value of the estate and that the terms of the transaction are fair, reasonable, and adequate, given the circumstances. *See In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011). A court will not approve financing "where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate"[6] and all parties-in-interest, or would serve to "skew the conduct of the bankruptcy case" and "destroy the adversary process."[7]

---

[6] *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990) (*citing In re Crouse Grp., Inc.*, 71 B.R. 544, 551 (Bankr. E.D. Pa. 1987); *see also In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).
[7] *See In re Mid-State Raceway, Inc.*, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005); *In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989); *See also Ames Dep't Stores*, 115 B.R. at 38; *General Elec. Capital Corp. v. Hoerner* (*In re Grand Valley Sport & Marine, Inc.*), 143 B.R. 840, 852 (Bankr. W.D. Mich. 1992).

7947040

## I.    THE PROPOSED DIP FINANCING IS UNWARRANTED UNDER SECTIONS 364(c) & (d) OF THE BANKRUPTCY CODE

21.    To obtain approval of post-petition financing, a debtor bears the burden of proving: (i) it is unable to obtain such credit otherwise; (ii) the proposed credit is necessary to preserve the assets of the estate; and (iii) the terms of the financing are fair, reasonable and adequate. *See In re Los Angeles Dodgers LLC,* 457 B.R. 308, 312-13 (Bankr. D. Del. 2011).  As set forth in further detail below, the rights and protections proposed to be granted here to the DIP Lenders are outside the bounds of what is fair, reasonable, and appropriate under the circumstances of these Chapter 11 Cases—ultimately to the detriment of the Debtors and their unsecured creditors. To protect and preserve value for the estates and the Debtors' unsecured creditors, the inappropriate provisions of the DIP Facility and the DIP Order, as applicable, should be stricken or modified as proposed herein.

### A.    The Debtors Have Not Evidenced That They Are Unable to Obtain Other Credit

22.    Under Bankruptcy Code Section 364(c) and (d), while courts do not require a debtor "to seek alternate financing from every possible lender . . . the debtor must make an effort to obtain credit without priming a senior lien." *In re 495 Central Park Ave. Corp.,* 136 BR. 626, 630-31 (Bankr. S.D.N.Y. 1992); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 550 (Bankr. E.D. Pa. 1987) (stating that debtor must show that it "made the requisite unsuccessful efforts to obtain credit . . . on other than the proposed less-than-desirable terms"); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Courts have found 20 attempts [to secure funding] and 2 attempts [to secure funding] to be sufficient under the particular circumstances of each case but . . . *one attempt is not sufficient*.") (emphasis added).

23.    Here, the Debtors have produced no evidence regarding the marketing and shopping of the DIP loan.  Rather, the only reference is to solicitation made in the February/March

10

2024 time frame.  *See* DIP Motion at 11 (stating " 11. As set forth more fully in the First Day

Declaration, prior to the Petition Date, the Debtor contacted upwards of thirty lenders in the

February / March 2024 period and only MidCap expressed interest in financing the Debtor's

business and two potential post-petition lenders but none of these parties was willing to provide

post-petition financing on terms better than the DIP Facility (as defined and described herein).")

The DIP Motion later states that "[a]s set forth herein, the Debtor contacted five potential lenders,

each of whom declined to provide post-petition financing on terms better than the DIP Facility."

*Id*. at ¶37.  However, there is nothing "set forth" therein regarding the Debtors' contact of "five

potential lenders" nor is such assertion in any certification

24.     Accordingly, the record must be supplemented on this front.  Otherwise, the

requirements of Bankruptcy Code sections 364(c) and (d) are not satisfied in this case, and to the

extent the DIP Loan was not shopped, the Debtors cannot satisfy a reasonable business judgment

standard.

**B.  The DIP Loan Is Illusory And Not In The Best Interests Of The Estates And Creditors**

25.     Post-petition financing should not be authorized if its primary purpose is to benefit

or improve the position of a particular secured lender.  *See, e.g., In re Aqua Assocs.,* 123 B.R. 192,

195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary

benefit of a party other than the debtor."); *In re Ames Dep't Stores.*, Inc., 115 B.R. 34 (Bankr.

S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose

of the financing is to benefit a creditor rather than the estate."); *Tenney Village*, 104 B.R. at 568

(debtor in possession financing terms must not "pervert the reorganizational process from one

designed to accommodate all classes of creditors and equity interests to one specially crafted for

the benefit of the secured creditor").

11

7947040

26.     Financing provisions that "tilt the conduct of the bankruptcy case" or "prejudice, at the early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors" are disfavored.  *Id.*  Moreover, the Debtors must demonstrate that the proposed DIP Facility is "in the best interest of creditors generally."  *In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (citing *In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983)); *see also Tenney Village*, 104 B.R. at 569 ("The Debtor's pervading obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries").

27.     DIP financing will not be approved when "a creditor leverages a debtor in possession into making a concession unauthorized by, or in conflict with, the Bankruptcy Code as a condition for the requested credit."  *In re Grand Valley Sport & Marine*, 143 B.R. 840, 852 (Bankr. W.D. Mich. 1992); *In re Berry Good, LLC,* 400 B.R. 741, 747 (Bankr. D. Ariz. 2008) ("While certain favorable financing terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements which convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender.").

28.     Here, MidCap, who is undisputedly oversecured, stands to receive a tremendous windfall from the proposed DIP Financing.  Specifically, for access to the proposed DIP Facility for approximately one month from entry of the Interim Order on December 26, 2024 through January 31, 2025—the DIP Lenders will receive, among other things:

a.  Seemingly Significant Fees;

b.  Roll-Up of Prepetition Obligations;

c.  Waiver of Marshaling;

d.  Waiver of Equities of the Case exception;

7947040

e.   Waiver of Section 506(c) Surcharge;

f.   Liens on Proceeds of Chapter 5 Causes of Action and Liens on Other Estate-Based Causes of Action and Proceeds Thereof ;

g.   Limitations on Committee Investigation of Prepetition Obligations; and

h.   Unfettered Indemnification, including in connection with challenge of Prepetition Obligations.

29.     These costly fees and protections are not appropriate in these cases where the DIP Facility itself, and the six (6) week budget associated therewith (the "Budget"), protect the DIP Lenders' collateral and reduce the DIP Lenders' exposure, serving only to enable the Debtors to fund a prompt disposition of the DIP Lenders' Prepetition Collateral benefiting the DIP Lender who would otherwise not have an adequate means of realizing on it.

30.     This court should not allow MidCap to reap the benefits of the exorbitant protections and fee structure of the DIP Facility while it is not required to extend substantial *new credit* to these estates, and while it is unclear what, if anything, unsecured creditors will be left with at the end of these Chapter 11 Cases. *Accord In re FCX, Inc.,* 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

*i.   The Roll-Up Is Especially Inappropriate In These Cases Where No Substantial New Funds Are Provided To The Debtors To Fund Operations*

31.     As a general matter, the permissibility of roll-ups under the Bankruptcy Code is, at best, uncertain. As observed by the Court of Appeals for the Eleventh Circuit, "[b]y their express terms, sections 364(c) and (d) apply only to future—*i.e.*, post-petition—extensions of credit. They do not authorize the granting of liens to secure [or awarding administrative expense status to] prepetition loans." *In re Saybrook Mfg. Co., Inc.,* 963 F.2d 1490, 1495 (11th Cir. 1992); *see also*

13

*In re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1334 (5th Cir. 1993) (noting that no Bankruptcy Code provision authorizes the payment of post-petition funds to satisfy prepetition claims).

32.    Moreover, courts that have approved roll-ups have done so ***only where*** there is a reasonable relationship between the amount of post-petition financing being extended and the size of the roll-up, ***and only*** to the extent "necessary to protect and preserve the estate." *In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *see also In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 1, 2009) [ECF No. 1002] (approving $3.25 billion roll-up with $3.25 billion new money in context of severe economy-wide credit crunch); *In re Belk Props. LLC*, 421 B.R. 221, 225 (Bankr. N.D. Miss. 2009) (denying motion to approve DIP financing where DIP term sheet provided, *inter alia*, an equity conversion feature exercisable at the DIP lenders' "relatively unlimited discretion" and finding that "once the financing order is final and non-appealable, the plan of reorganization is a fait accompli, that is, it is an accomplished fact for all practical purposes"); *cf Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 137 S.Ct. 973, 975 (2017) (noting that courts that have authorized rollups have required that "even the disfavored creditors [be] better off").

33.    Indeed, under the DIP Financing Guidelines approved by this Court, a court considering "the propriety of a rollup will normally take into account . . . [t]he nature and ***amount of new credit*** to be extended, beyond the application of proceeds of post-petition financing used to pay in whole or in part the prepetition debt." *See General Order Adopting Guidelines for Financing Requests* (Gambardella, B.J.) (December 1, 2009) (the "NJ Financing Guidelines") sec. A.1b (emphasis added).

7947040

34.     The proposed DIP, which provides limited new credit, it amounts to nothing more than a unwarranted cross-collateralization provision and should be denied. *Cf In re LATAM Airlines Grp. S.A.,* 620 B.R. 722, 795 (Bankr. S.D.N.Y. 2020) ("courts have held cross-collateralization clauses to be illegal per se.") (citing *In re Adams Apple, Inc.*, 829 F.2d 1484 (9th Cir. 1987)).

35.     Accordingly, the Roll-Up should not be approved at all or, in the alternative, should be limited proportionally to the amounts actually funded. *See, e.g., In re Blockbuster Inc., et al.,* Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Oct. 27, 2010) (Docket No. 432) (reduction of proposed 2:1 roll-up to 1:1 in response to committee objection).

### ii.    *MidCap's Claim Likely Includes an Unenforceable Default Penalty*

36.     The $450,000 Default Penalty is inappropriate under the Bankruptcy Code, unenforceable under applicable law, and inconsistent with equitable principles that govern bankruptcy proceedings.

37.     Whether a liquidated damages clause is an unenforceable penalty is a question of state law. *In re 1141 Realty Owner LLC*, 598 B.R. 534, 541-42 (Bankr. S.D.N.Y. 2019). A liquidated damages clause will be enforced under New York[8] law only if: (1) actual damages are difficult to determine, and (2) the sum is not "plainly disproportionate" to the possible loss. *Id.* at 542 (citations omitted). The court in *1141 Realty Owner LLC* further explained that:

> The party seeking to avoid the liquidated damages clause bears the burden of proving that it is a penalty and must demonstrate either that the damages flowing from the prepayment were readily ascertainable at the time the parties entered into the lending agreement or the prepayment premium is 'conspicuously disproportionate' to the lender's foreseeable losses. *JMD Holding Corp. v. Cong. Fin. Corp.*, 828 N.E.2d 604, 609 (2005).

---

[8] The Prepetition Loan Agreement states that it "THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED INACCORDANCE WITH THE INTERNAL LAW OF THE STATE OF NEW YORK". *See* Prepetition Loan Agreement at ¶13.

598 B.R. at 542.

38.    In this case, the $450,000 default fee does not appear to be based on actual damages or costs incurred by the lender but is a flat fee tied to the timing of the default, making it arbitrary and punitive.  It appears designed to deter early default and significantly diminishes estate value without justification. It seems disproportionate to the lender's foreseeable losses as it amounts to damages in the amount of $450,000 for a loan that originated just over nine months ago.  And it seems that MidCap has suffered no damages here (only outgained profit at the expense of creditors and other stakeholders), as it used its leverage over the Debtors to force the Debtors to agree to an overly expensive illusory DIP loan in which it immediately paid itself, ***and*** set itself up to earn an additional fees, as well as an additional interest to boot, likely including on account of the Default Penalty.

39.    While section 506(b) provides oversecured creditors with the opportunity to recover interest, fees, and charges, such recoveries are not automatic and remain subject to strict standards of enforceability, reasonableness, and equity.   Here, allowing a disproportionate and punitive fee would reduce recoveries for unsecured creditors and undermine the fundamental principles of equitable distribution and estate preservation.

40.    For all of these reasons, the Default Penalty portion of the claim be declared null and void and rejected or, at a minimum, carved out from any permissible "roll-up" and otherwise remain fully and completely subject to the Committee's rights to challenge in due course.[9]

---

[9] While the Interim Order provides "[t]he Final Roll-Up shall be subject to the challenge rights of the parties set forth in Section VIII below and in the event of a successful Challenge the Court may fashion an appropriate remedy." (Interim Order ¶8) such provision is insufficient due to the multitude of other provisions, including that the Debtors are to pay MidCap's fees in defending any such Challenge, and to indemnify MidCap, and that the Committee is allotted only $20,000 "to investigate (but not prosecute) claims or any Challenge against and possible objections with respect to the Pre-Petition Obligations, and the pre-petition liens and security interests of, the Pre-Petition Lender (including, without limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of the Pre-Petition Lender)" (Interim Order, ¶18).

## II.    OTHER TERMS OF THE DIP FACILITY ARE NOT FAIR AND REASONABLE

41.    The remaining terms of the DIP Facility contain a number of troubling provisions warranting denial or modification of the relief sought in the DIP Motion.

### A.    The Proceeds of Avoidance Actions And Other Litigation Claims Must Be Preserved for the Benefit of Unsecured Creditors

42.    Avoidance actions under chapter 5 of the Bankruptcy Code enjoy the unique classification of being a creature of the chapter 11 process.  They are statutory rights held by debtors in trust for the benefit of unsecured creditors.  *See Buncher Co. v. Official Comm. Of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) (noting that the "purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully part of the bankruptcy estate" and "when recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors"); *In re Cybergenics Corp.*, 330 F.3d 548, 567 (3d Cir. 2000) (stating the underlying intent of the avoidance powers in bankruptcy is the recovery of valuable assets for the benefit of a debtor's estate); *In re Integrated Testing Prods. Corp.,* 69 B.R. 901, 905 (D. N.J. 1987).

43.    Thus, avoidance actions should not be pursued, or in this case, released, for the exclusive benefit of a secured creditor.  *Id.  See also In re Roblin Indus., Inc.*, 52 B.R. 241, 243 (Bankr. W.D.N.Y. 1985) (denying proposed debtor-in-possession financing where, as a condition to extending the loan, the debtors were required to waive avoidance actions against the lenders in violation of their fiduciary duties).

44.    The proceeds of the claims and causes of action proposed to be pledged to MidCap should be preserved for the benefit of unsecured creditors, who in turn should decide whether to pursue such claims.  Indeed, given MidCap's seemingly inflated claim amount and the likely

administrative expenses of these Chapter 11 Cases, the avoidance actions may be the only truly meaningful source of recovery for unsecured creditors in these Chapter 11 Cases.

45.     Furthermore, the Committee has preliminary concerns about the Prepetition Loan Agreement, and both the circumstances under which it was entered into given the state of the business of the Debtors and the aggressive Default Penalty contained therein, which was swiftly triggered.[10]  As such, the Committee objects to any attempt to grant MidCap (or any other party) liens on any recoveries in respect of any fiduciary claims or causes of action that the Debtors' estates may be entitled to assert against any directors and officers, including any proceeds that can recovered pursuant to such claims under any applicable insurance policies.

46.     The value of these actions, which are currently unencumbered, could serve as a source of additional liquidity for the Debtors, as well as a means to increase recoveries for all of the Debtors' creditors. Given that the DIP already provides MidCap with a number of additional forms of consideration in exchange for the DIP Facility, in addition to their substantial prepetition collateral (to the extent validly pledged), it would be inappropriate, especially at this early stage in these cases, to deprive the estates and their creditors of this potential unencumbered value in favor of preferencing an already secured lender.

### B.  The Proposed Section 506(c) and 552(d) Waivers Are Inappropriate

47.     Section 506(c) is a rule of fundamental fairness for all parties in interest, providing hat secured creditors must share some of the burden of administrative expenses in a bankruptcy case where it is reasonable and appropriate for surcharges to be ordered. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 12 (2000).

---

[10] While the Committee is not aware of the asserted default date, it notes that the Prepetition Loan Agreement was executed just over nine months ago

7947040

48.    The DIP Motion[11] requires the Debtors to waive their rights under section 506(c) of the Bankruptcy Code to recover the reasonable and necessary costs and expenses of preserving or disposing collateral securing an allowed secured claim.  *See* Proposed Final Order at ¶ 51.  Such rights are granted to the Debtors by statute, and exist to protect their estates from administrative expenses that only inure to the benefit of the lender whose collateral is being preserved or disposed of.  11 U.S.C. § 506(c); *see also In re Visual Industries, Inc.*, 57 F.3d 321, 325-26 (3d Cir. 1995).

49.    Section 506(c) was designed to prevent a "windfall to the secured creditor at the expense of the claimant."  *Id.* (*citing IRS v. Boatmen's First Nat'l Bank of Kansas City*, 5 F.3d 1157, 1159 (8th Cir. 1993)).  Accordingly, section 506(c) "understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . . ."  *Id.*

50.    The Supreme Court has held that waivers of rights provided under section 506(c) must not be granted lightly, and should be consistent with the Debtors' fiduciary duty to their creditors.  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 12 (2000) (Section 506(c) is a rule of fundamental fairness to all parties in interest; the authorization to surcharge a secured lender's collateral is proper where it is reasonable and appropriate, and a debtor's decision to waive such rights must be made in a manner consistent with its obligations to "seek recovery under the section whenever [a debtor's] fiduciary duties so require."); *see also* NJ Financing Guidelines § A.5 ("Extraordinary Provisions include any waiver of the debtor's right to a surcharge against collateral under § 506(c) of the Bankruptcy Code").

---

[11] We note that as of the filing of this Objection, the Debtors have not yet provided proposed counsel to the Committee the final drafts of the final proposed orders, and the Committee reserves all rights with respect to the proposed relief and language set forth in the respective proposed final orders.

7947040

51.     Here, the section 506(c) waiver serves no purpose, other than to eliminate a potential avenue of recovery for the Debtors' estates by ensuring the costs of the restructuring will be further borne by the unsecured creditors, even if they receive no value.

52.     The Debtors have not provided any justification for a section 506(c) waiver, much less one that sufficiently justifies the windfall MidCap will receive from the waiver. *See, e.g., Visual Indus.*, 57 F. 3d at 325 (finding that section "506(c) is designed to prevent a windfall to the secured creditor at the expense of the claimant"); *see also Hartford Fire Ins. Co. v. Norwest Bank Minn, N.A. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (B.A.P. 8th Cir. 1998); *Kivitz v. CIT Group/Sales Fin., Inc.,* 272 B.R. 332, 334 (Bankr. D. Md. 2000) (Bankruptcy Code section 506(c) exists so that unsecured creditors are not required to bear the cost of protecting collateral that is not theirs and to require the secured party to bear the costs of preserving or disposing of its own collateral); *In re Codesco Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

53.     Moreover, the Committee has not had any time to evaluate the budget or the proposed Carve Out, which is defined in the Interim Order as subject to, and capped by the Approved Budget.12  So, the proposed waiver of Bankruptcy Coode section 506(c) is particularly inappropriate given that there is no guarantee that the proceeds of any sale will result in any recovery for unsecured creditors, much less that payment in full of administrative creditors.

---

12 The Approved Budget has a line item for "Legal and Professionals" totaling $677,023, but it is unclear how such amounts are allocated and whether this includes all case professionals, including any transaction fee owed to the Debtors' proposed investment banker.  No retention applications have been filed to date..

7947040

54.    Therefore, the surcharge and other waivers should be stricken from any proposed Final Order on the DIP Motion in their entirety.

### C.  The Committee Must be Allowed to Fulfill its Fiduciary and Statutory Duties

#### i.    *The Challenge Period Deadline Should Be Modified*

55.    Insofar as the Committee was just appointed on January 6, 2025 and the proposed sale hearing date is January 29, 2025, the Interim DIP Order provides the Committee with a Challenge Period of a mere twenty-one (21) days from formation (or put more bluntly, excluding weekends and holidays, ten (10) business days from today)[13] in which it must (i) complete its investigation, (ii) have standing to file a adversary proceeding and, (iii) actually file an adversary proceeding challenging the amount, validity, enforceability, priority or extent of the Pre-Petition Obligations, the liens of the Pre-Petition Lender on the Pre-Petition Collateral securing the Pre-Petition Obligations or (y) otherwise asserting any other claims, counterclaims, causes of action, objections, contests, or defenses against the Pre-Petition Lender on behalf of the Debtors' Estates ((x) and (y), collectively, referred to herein as "<u>Challenges</u>") in connection with the matters related to the Pre-Petition Financing Documents, the Pre-Petition Obligations, the Pre-Petition Liens, or the Pre-Petition Collateral".[14]  Interim Order, ¶23.

56.    In order to enable the Committee to pursue any Challenges to asserted prepetition liens, the Committee should be entitled to sixty (60) days *from the date of the order authorizing the employment of counsel to the Committee*, as prescribed by the N.J. Financing Guidelines.  *See* D. N.J. Financing Guidelines, § 3 (a). Courts are reluctant to deviate even slightly from lien

---

[13] The Interim does state "which shortened period is subject to the Creditors' Committee's right to seek an extension on an expedited basis for cause shown prior to expiration of such period…" Interim Order, ¶23

[14] The filing of a motion of standing with a draft complaint identifying and describing all Challenges will toll the Initial Challenge Period solely with respect to the Challenge(s) asserted in the draft complaint until three (3) business days from the entry of an Order granting the motion for standing to prosecute such Challenge(s) described in the draft complaint and permitted by the Court.  Interim Order, ¶23.

challenge deadlines imposed by local rules and general orders as the Debtors propose here. *See Never Slip Holdings, Inc., et al*, Case No. 24-10663 (LSS) (Bankr. D. Del), April 3, 2024 Hr'g Tr. 91:12-25 & 92:1 [Dkt. No. 65] (Judge Silverstein expressing concern over a provision that required a party to notify the debtors of its intent to investigate) ("I can see this becoming the new norm and that's what I don't like. Okay? . . . And what's the special circumstance here? Quite frankly, there's no special circumstance here. We get quick sale cases all the time. We get quick credit bid cases all the time. We just get quick cases all the time. And I don't see anything special here . . . They may not like the alternatives, but we did it for years.").

> ii. *The Committee's Challenge Rights Must Be Broadened And Protected.*

57. The DIP Order must be clarified to ensure that the Committee's Challenge rights are preserved with respect to, among other things, the proposed Roll-Up, releases and indemnification of the DIP Lenders and Prepetition Secured Parties, adequate protection liens and payments, credit bid rights, and any acknowledgements, agreements, and stipulations set forth in any Interim or Final DIP order.

58. Also, a Challenge should not be limited to what is contained in the original complaint.

> iii. *The Budget Allocated to the Committee and to the Investigation of Prepetition Liens is Inadequate*

59. The Proposed Final Order provides for $20,000 for the Committee to investigate, but not prosecute, the Prepetition Obligations, which is inadequate. As with other restrictions, this budget again limits the Committee's ability to discharge its statutory duties, with the desired effect of shielding MidCap from potential claims. *See, e.g., In re Ames Dep't Stores*, 115 B.R. at 40 ("[F]ailure to provide a reasonable sum for professionals has, in other cases before this Court, left

7947040

estates, creditors' committees and trustees without the assistance of counsel and the Court without

the adversary system contemplated by Congress.")

60.     A lien investigation limitation intentionally forces the Committee's professionals to

fund matters related to the Debtors' reorganization, and harms the adversary system characteristics

of the chapter 11 process.  The Committee submits that the investigation budget be increased to

not less than $50,000 for these Chapter 11 Cases.

61.     Additionally, it is unclear whther and to what extent the Committee's Professional

fees are included in the Approved Budget.  Committee Professional fees should not be capped by

the DIP Budget or included in the DIP Budget covenant. The Committee's professionals must have

latitude to act for the benefit of their constituency without being subject to the control of third

parties with potentially divergent interests. In any event, Professional fees should not be included

in any DIP Budget covenant at all and such line items must be revised to allocate sufficient

resources for the Committee to satisfy its fiduciary duties.

### D.  Additional Objectionable Provisions

#### i.  *Waiver of Marshaling and Other Equitable Doctrines Are Unjustified*

62.     The equitable doctrine of marshaling should not be waived.  Marshaling requires a

secured creditor to first seek recovery from assets against which other creditors do not have a claim

before looking to common assets.[16]  *See In re Advanced Marketing Servs., Inc.*, 360 B.R. 421, 427

n.8 (Bankr. D. Del. 2007) ("[Marshaling] requires the senior secured creditor to first collect its

debt against the collateral other than that in which the junior secured creditor holds an interest,

thereby leaving that collateral for the junior secured creditor's benefit.") (citation omitted); *see also*

---

[16] The Committee is investigating the extent of MidCap's purported liens on collateral.

7947040

*In re Tampa Chain Co.*, 53 B.R. 772, 777 (Bankr. S.D.N.Y. 1985) (*citing* 2 J. Story, *Commentaries on Equity* Jurisprudence 230 (1884)); *Cannon v. Hudson*, 5 Del Ch. 112, 116 (Del. Ch. 1876).

63.     Marshaling "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *See Meyer v. United States*, 375 U.S. 233, 236 (1963).   It is well settled that bankruptcy courts can marshal a debtor's assets to effectuate an equitable distribution to creditors. *See Tampa Chain Co*., 53 B.R. at 777.

64.     The right to invoke the doctrine of marshaling against MidCap must be preserved for the benefit of the estate. *See In re America's Hobby Center, Inc.*, 223 B.R. 275 (Bankr. S.D.N.Y. 1998) (creditors' committee permitted to seek to assert marshaling defense against secured creditor on behalf of the debtor's estate). Waiving the doctrine of marshaling at this time is premature, as the Committee has not had an opportunity to investigate the Debtors' organizational structure, MidCap's prepetition loan documents, its role (if any) in creating the organizational structure of the Debtors, and any decisions surrounding which entities would file for chapter 11 protection.  Moreover, a prospective waiver of marshalling would deprive unsecured creditors from realizing value from, for example, Avoidance Actions. For this reason, the waiver should be stricken.

65.     The Committee also objects to the waiver of the "equities of the case" exception pursuant to section 552(b) of the Bankruptcy Code.  The Debtors have failed to establish why such statutory and equitable powers should be surrendered at this early stage of the case.

66.     "The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of assets of the estate—which normally would go to general creditors—to cause the appreciated value." *In re Muma Servs.*, 322 B.R. 541, 558-59 (Bankr. D. Del. 2005) (citation

omitted).  In essence, the Debtors are asking the Court to rule in advance that there are no, nor will there ever be, equities of the case that may justify abrogating the liens granted pursuant to the Proposed Final Order for any reason.

67.      There is no legal support for the requested relief because the equities of the case exception pursuant to section 552(b) of the Bankruptcy Code is a statutory grant of power to the Court, not the Debtors.  The statute governs the effect of prepetition liens on postpetition property, and leaves to the Court's discretion to justify the allocation of postpetition value to secured and unsecured creditors depending on what transpires in the case.  Such a waiver is neither warranted nor required.

68.      Considering that the Committee has only recently been appointed and has not yet had the opportunity to properly examine the nature, extent, and validity of the liens asserted by the MidCap, it would be inappropriate to deprive the estates of valuable rights that might yield a recovery to the benefit of all stakeholders.  *See, e.g., In re Metaldyne Corp.*, 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make.  If, in the event, the Committee or any other party [in] interest argues that the equities of the case exception should apply to curtail a particular lender's rights, the Court will consider it."); *In re TerreStar Networks, Inc.*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y. 2011) (denying waiver of section 552(b) as premature because factual record was not fully developed).

> ii.      *Debtor's Access to Liquidity Should Not Be Unduly Restricted*

69.      Further problematic, it is unclear whether the Debtors have sufficient access to liquidity under the DIP in light of, among other things, (i) the burdensome "Borrowing Base" definition, (ii) the overreaching events of default that terminate the Debtors' access to liquidity and

the (iii) repayment of the already oversecured DIP Lenders while denying the Debtors' access to much needed funds.

70.     In short, the proposed DIP Facility provides no assurance that these cases will be funded through the sale process (let alone to their conclusion). Fundamentally, the Committee cannot consent to a DIP that provides the MidCap with all the benefits of the chapter 11 process—including a complete Roll-Up, untold amounts of interest and fees—while MidCap exercises seemingly boundless discretion over whether and how much to lend to the Debtors.  Insofar as the Debtors delivered a stalking horse asset purchase agreement that includes a cash bid of $13 million, MidCap should not be permitted to deprive the Debtors of funds needed for their sale process.

71.     Postpetition financing should require firm commitments from lenders, and debtors should not bind themselves to onerous terms in exchange for illusory promises.  If MidCap wants to enjoy the benefits that postpetition financing can provide—including a roll up of their prepetition debt, and, more importantly, the fruits of the proposed sale process—they must be willing to provide the liquidity necessary to meet the needs of the Chapter 11 Cases through their conclusion. Because the proposed DIP seemingly fails to meet that benchmark, MidCap should not be permitted to reap these outsized benefits at the expense of the prepetition creditors.

     *iii.* *The Maturity Date Should Be Modified and Termination Fee Eliminated*

72.     The maturity of the DIP Facility is also very problematic in that it is tied to the sale closing on or before January 31, 2025, which also includes another termination fee. However, even if a winning bidder is timely selected, the sale may not close due to, for example, potential regulatory hurdles. The most problematic aspect of the proposed schedules set forth in the DIP Motion and the Bid Procedures Motion is that a hearing to approve a sale of the Debtor's assets is to be scheduled for January 29, 2025, and the closing on the sale must occur by January 31, 2025, given the Debtors and counterparty a mere 2 days to close on a sophisticated sale that will

26

undoubtedly encounter unforeseen obstacles.   At the very least the maturity date should be extended to accommodate all reasonable delays if the parties are otherwise working in good faith and on track to closing.  Moreover, the termination fee should be eliminated if a closing does not occur by January 31, 2025, or, at least extended along with the extended maturity date.

73.     Likewise, In addition to the foregoing, the following provisions of the DIP Facililty are objectionable for the reasons stated below:

- **Releases**:  The releases are inappropriate in light of the limited new money extended under the DIP Facility. Furthermore, the Committee should not be bound by any indemnification provisions or releases until the expiration of the Challenge Period.

- **Notice**:  The Committee should receive simultaneous copies of any all financial reports, forecasts, budget to actuals, variance reports, and all other documents delivered to MidCap.

- **Interest rates**:

- **MidCap's Professional Fees and Other Invoices**: Invoices should always require a minimum of 10 days' notice with the Committee's opportunity to object and must contain reasonable detail to evaluate the services rendered

## III.    THE BIDDING PROCEDURES MOTION SHOULD BE MODIFIED TO BETTER PROTECT THE ESTATE

74.     On December 22, 2024, the Debtor entered into an asset purchase agreement (the "APA") with the Stalking Horse Bidder, a copy of which is attached to the Bid Procedures Motion as Exhibit A.  Through the Bid Procedures Motion, the Debtors seek, *inter alia*, the Court's approval of: (i) procedures for bidding on and conducting an auction of the Debtors' assets (the "Bidding Procedures"), (ii) bid protections for the Stalking Horse Bidder, including a break-up fee

and expense reimbursement; and (iii) notice and related procedures relating to the assumption and assignment of executory contracts and unexpired leases. *See* Bid Procedures Motion ¶¶ 10-18.[17]

75.     The Bidding Procedures and APA provide for the sale, pursuant to section 363 of the Bankruptcy Code (the "Sale"), of substantially all of the Debtors' assets to the Stalking Horse Bidder, or to a higher bidder at auction. *See* Bid Procedures Motion, ¶¶ 16-18 and Exhibit B (proposed Bidding Procedures Order), Exhibit 1 thereto (Bidding Procedures), generally.

76.     The APA provides, among other things, that the Debtors propose to sell to the Stalking Horse Bidder:

> the [Debtor's] right, title, and interest in and to all of its assets, properties, and rights of every kind, nature, and description, whether tangible or intangible, wherever located and by whomever possessed relating to the Business and the Real Property, except for the Excluded Assets (collectively, the "Purchased Assets"), free and clear of any and all interests, obligations, rights, encumbrances, pledges, liens (including without limitation, mechanics' materialmans' and other consensual and nonconsensual liens and statutory liens), mortgages…..

*See* APA, Article 1.1(a).

77.     The Debtor also proposes to sell "all rights, causes of action (other than Avoidance Actions under Article 5 of the Bankruptcy Code), and claims, known or unknown, matured or unmatured, accrued or contingent, against third parties (including all rights under warranties, indemnities, and other contractual claims, whether express, implied. [sic] or otherwise), to the extent related to any Purchased Assets for the Business" (collectively, the "Litigation Assets"). *See* APA, Article1.1(a)(vii).

---

[17] Capitalized terms used but not defined in this Section III shall have the meaning ascribed to them in the Bid Procedures Motion or exhibit thereto as appropriate.

### A.      The Debtor's Litigation Assets Should Not Be Sold[18]

78.      To approve a sale of estate assets outside of the ordinary course of business under section 363(b) of the Bankruptcy Code, the sale proponent bears the burden of demonstrating, at minimum, that: (1) there is a sound business purpose for the sale; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith. *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).

79.      Where a debtor seeks to sell substantially all assets through an expedited sale process under section 363, the sale requires closer scrutiny because such a sale deprives creditors of the safeguards afforded by the confirmation process. *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, at *27-28 (Bankr. D.N.J. Mar. 26, 2008), quoting *In re Medical Software Solutions*, 286 B.R. 431, 445 (Bankr. D. Utah 2002) (internal quotations omitted) ("[W]hen a pre-confirmation [Section] 363(b) sale is of all, or substantially all, of the Debtor's property, and is proposed during the beginning stages of the case, the sale transaction should be closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization.").

80.      In such expedited sales, the debtor bears a heightened burden beyond mere sound business judgment.  *See In re CGE Shattuck, LLC*, 254 B.R. 5, 12 (Bankr. D. N.H. 2000) (internal

---

[18] The Committee recognizes that the sale of the Debtor's assets will be subject to approval at a later hearing.  However, given the expedited schedule being sought in the Bid Procedures Motion, and also given that the APA, as currently drafted, envisions a sale of the Debtor's Litigation Assets, the Committee raises its objection to the inclusion of the Litigation Assets in any purported sale at this time in order to put all parties on notice of its objection to the sale of these assets.  Furthermore, the Committee is willing to engage in good faith discussions with the Stalking Horse Bidder or other interested bidders to potentially modify the language currently set forth in APA, Article1.1(a)(vii) to permit the sale of certain claims relating to the purchased business assets, while retaining estate claims against potentially liable parties that are not properly included a section 363 sale absent a specific evidential showing that the merit of such claims has been properly analyzed, along with a detailed explanation of the consideration being given to the Debtor's estate in exchange for the sale of such assets.

7947040

citations omitted) (holding that "a debtor may not use the provisions of § 363 to deny creditors the protections they would receive under Chapter 11 if the transaction were part of a plan of reorganization" and that "[t]he closer a proposed transaction gets to the heart of the reorganization process, the greater scrutiny the Court must give to that matter."); *In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) ("[I]n the absence of the protection and finality offered by a disclosure statement and plan, such a transaction pursuant to Section 363(b) requires specific authorization by the Court. The sale must be closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization.").

81.    Furthermore, any proposed sale of the Litigation Assets is both a sale of a debtor's assets outside the normal course of business and a compromise that must meet heightened scrutiny and "fair and equitable" tests governing compromises.  *In re Lahijani*, 325 B.R. 282, 284 (9th BAP 2005).

> We now conclude that, when a cause of action is being sold to a present or potential defendant over the objection of creditors, a bankruptcy court must, in addition to treating it as a sale, independently evaluate the transaction as a settlement under the prevailing "fair and equitable" test, and consider the possibility of authorizing the objecting creditors to prosecute the cause of action for the benefit of the estate, as permitted by § 503(b)(3)(B). Accordingly, we REVERSE the order approving the sale of the estate's causes of action under § 363.

*In re Lahijani*, 325 B.R. at 284.

> [U]nder the "fair and reasonable" test laid out by the Supreme Court . . . courts are instructed to apprise themselves "of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the

7947040

> proposed compromise. . . the Third Circuit, in *Martin*, set forth four
> criteria that a bankruptcy court should consider in striking a balance
> between the "value of the claim that is being compromised against
> the value to the estate of the acceptance of the compromise
> proposal." *Martin*, 91 F.3d at 393. Those criteria are: (1) the
> probability of success in litigation; (2) the likely difficulties in
> collection; (3) the complexity of the litigation involved, and the
> expense, inconvenience and delay necessarily attending it; and (4)
> the paramount interest of the creditors. *Id.*

*Travelers Cas. & Sur. Co. v. Future Claimants Representative*, 2008 WL 821088, at *4–5 (D.N.J.

Mar. 25, 2008) (quoting *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)).  In

addition, a proposed sale must be made in "good faith."  *In re Abbotts Dairies of Pennsylvania,*

*Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).

82.    To the extent the Debtor seeks to include the Litigation Assets in the sale to the

Stalking Horse Bidder (or any other party), sufficient evidence must be adequately developed to

support an analysis of the *Martin* settlement factors.  Absent such a showing, the Litigation Assets

should be excluded and carved out from any sale.

### B.    The Proposed Schedule Should Be Slightly Adjusted

83.    The Debtor Proposes to have the Bid Procedures Motion approved at the hearing

currently scheduled for Friday, January 10, 2025, with bids due ten days later, on January 20, 2025

and a potential auction scheduled for January 27, 2025 (the "Proposed Auction Schedule").  The

Committee understands the necessity to move this sale process forward in an expedited manner,

and, does not object to the overall proposed auction schedule in light of the current liquidity

pressures facing the Debtor and the pre-petition marketing efforts outlined in the Declaration of J.

Scott Victor dated January 7, 2025 [ECF No. 60-1].

84.    However, in order to provide interested parties with some additional time to

formulate and submit bids following the entry of an order on the Bid Procedures Motion, the

Committee requests that the bid deadline be moved from Monday, January 20, 2025, to Wednesday, January 22, 2025.  The holding date for the auction on January 27, 2025 can still remain in place, and, the proposed hearing date for potential approval of the sale of the Debtor's assets can still be held on January 29, 2025.  This proposed slight modification does not alter the overall timing proposed in the Bid Procedures Motion, but, it will provide interested parties a few more days to potentially submit bids.

### C.     Proposed Edits/Clarifiations To The Bidding Procedures

85.     As set forth in paragraph 21 of the Bid Procedures Motion, the definition of "Consultation Parties" includes the legal and financial for the Committee, and the Bidding Procedures generally permit the sufficient participation of the Committee's professional advisors in the bidding and auction process.

86.     However, the Committee requests that the Bidding Procedures be modified to expressly permit and require that the Committee's professionals: (1) be provided with full copies of all submitted bids with twenty-four hours of the ultimate bid deadline; and (2) be expressly authorized to attend the auction along with the other parties identified in the Bidding Procedures.

### CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court (i) modify the DIP Facility and terms as set forth herein; (ii) modify the schedule for the bidding and auction, and the Bidding Procedures as set forth herein; and (iii) grant such other and further relief as the Court deems just and proper.

*[remainder of page intentionally left blank]*

7947040

Respectfully submitted,

**PORZIO, BROMBERG & NEWMAN, P.C.**

Dated: January 9, 2025                    By: _/s/ Brett S. Moore_____
                                              Brett S. Moore, Esq.
                                              Kelly D. Curtin, Esq.
                                              100 Southgate Parkway
                                              P.O. Box 1997
                                              Morristown, New Jersey 07962
                                              (973) 538-4006
                                              (973) 538-5146 Facsimile
                                              Email: bsmoore@pbnlaw.com
                                                     kdcurtin@pbnlaw.com

7947040